**UNITED STATES of America, Plaintiff,**

**v.**

**Trinidad SALGADO, Defendant.**

**No. C–4951.**

United States District Court,
E.D. Washington.

March 25, 1988.
As Modified Nov. 3, 1988.

John Lamp, U.S. Atty., James B. Crum, Asst. U.S. Atty., Spokane, Wash., for plaintiff.

Al Kitching, Kayne & Kitching, Spokane, Wash., Michael Mullery, San Francisco, Cal., for defendant.

### ORDER

ROBERT J. McNICHOLS, Chief Judge.

On March 4, 1988 Mr. Salgado brought a motion under Rule 60(b)(6), *Federal Rules of Civil Procedure,* to set aside a conviction obtained against him in this district in 1964. A conference was held on March 22, 1988 at 8:30 a.m. AUSA Crum and Mr. Kitching appeared personally, and Mr. Mullery and Mr. Salgado participated telephonically. It was the general consensus of all concerned that the equities militate strongly in favor of relieving defendant from prospective operation of the judgment. The question is whether, equities aside, the Court has authority to take any action. As Mr. Salgado was advised at the close of the conference, were there anything that could be done for him in this proceeding, it would be.

The facts are undisputed. Mr. Salgado first entered the country lawfully in 1943 as a seasonal agricultural worker under the Bracero program. He returned during harvest season over the ensuing years and in 1947 married a United States citizen. He was granted status as a permanent resident alien the following year. For some reason not reflected in the record, defendant apparently never applied for naturalization. In 1964 he pled guilty to a charge of failing to pay transfer tax on what, by today's standards, would be a small quantity of marijuana and was sentenced to a two-year term of imprisonment. While incarcerated, he went through deportation proceedings and was ordered deported. After serving approximately eighteen months, he was released from prison and self-deported. Advised by prison officials that he could not re-enter the United States for a period of two years, he followed that direction and remained in Mexico until 1969 when he re-entered the United States using the green card which had never been taken from him.

Life went on uneventfully thereafter for the next fifteen years. Mr. Salgado found steady work with a rancher in California and was inspected on numerous occasions by INS agents without incident. He spent vacations in Mexico from time to time and neither the validity of his green card nor his right to re-enter was ever questioned.

In 1984 Mr. Salgado applied for Social Security benefits. During a routine eligibility investigation, the SSA determined that defendant had been deported and that so far as the INS was concerned, he was in the country unlawfully. He and his wife thereafter visited relatives in Mexico, as they had on occasion over the years. While there, Mr. Salgado contacted the American Embassy to seek clarification of his status. State was apparently not plugged into the same computer as was INS, because defendant was told that his green card was valid, and that he was a lawful permanent resident. In the meantime, his wife filed an I–130 petition with the INS seeking immediate relative status. The filing of the petition triggered an investigation which culminated in Mr. Salgado's arrest as an illegal and the commencement of deportation proceedings which are currently ongoing.

According to defense counsel, the best that Mr. Salgado can expect from the administrative process under present law is an indeterminate deferral which would allow him to remain in the country without status and subject to periodic review. In that undocumented nether world, his fami-

ly would not be entitled to Social Security benefits.

As the parties are aware, there are significant questions concerning the availability of the relief sought; including, *inter alia:* (1) whether FRCP 60 applies to criminal proceedings; (2) whether the circumstances set forth above would warrant such extraordinary relief; and (3) whether the unprecedented delay of twenty-four years since the time of conviction would per force preclude consideration of the subject motion. Furthermore, questions of technical propriety aside, while a court generally decides only the case before it, based on the facts as they are found, and on the law as it appears at the time, there is always a concern for establishing bad precedent. It is virtually a foregone conclusion that once the amnesty window closes in May of this year and the INS turns its efforts to the enforcement provisions of IRCA, the courts are going to be inundated with hardluck tales such as presented here. Some will involve aliens who could have, but did not, avail themselves of the amnesty program. Some will involve aliens who were not eligible, perhaps for the same reason as Mr. Salgado. It is impossible to see around all of the corners, but it would seem a legitimate concern of the system that vacation of a longstanding judgment be a jealously guarded exception to cure the freakish case rather than a readily available remedy to cure the mundane.

Defendant argues that he was denied effective assistance of counsel because a competent attorney familiar with immigration law may have been able to engineer a plea agreement which would not have rendered him deportable; or alternatively, if no such bargain was possible, he could have taken his chances on trial. With regard to the first, it is difficult to see how a more propitious bargain could have been reached. Mr. Salgado was charged with four counts, any one of which would have

rendered him deportable. As to the alternative of going to trial, the events of 1964 are far too remote in time to allow for any rational appraisal. The presiding judge is long since deceased. The present whereabouts of the prosecutor are unknown. While Mr. Salgado might be expected to testify that in retrospect, he would have cheerfully taken his chances with the jury had he been aware of his jeopardized status, the trustworthiness of any such post facto statement would be suspect in light of the draconian penalties for drug trafficking then in effect which defendant would have risked had he been convicted of all four counts. The net result is that it is difficult to see how any factual basis could be developed in support of this aspect of the case.

A further position advanced is that the Court should have counseled Mr. Salgado as to the potential collateral consequences to insure that his plea was voluntary. While that may be the rule in various state courts, counsel cites no authority for that proposition in the federal system and the Court knows of none.[1]

It is also argued that if Mr. Salgado had been represented by counsel at the time of the deportation proceeding, that attorney may have been able to successfully contend for an early application of the rule eventually espoused in *Francis v. Immigration & Naturalization Service,* 532 F.2d 268, 272–73 (2nd Cir.1976) (expanding availability of § 212(c) waiver to resident aliens). That postulation in itself is highly speculative, but more to the point, the deportation proceeding post-dated the occurrence which forms the subject matter of this suit; *viz.,* the conviction in this Court.

Mr. Salgado also contends that his deportation hearing was a farce, and that he was not even aware of the nature of the process, believing instead that the hearing was

[1] Indeed, it was only a matter of weeks ago that this Court learned that an alien, legal or otherwise, who is convicted on a drug charge will automatically face deportation proceedings. *United States v. Shkuratoff,* E.D.Wash., No. CR–86–253–1, Order entered March 1, 1988.

for the purpose of considering early release from incarceration. Were defendant now charged with being an alien in the United States after deportation under 8 U.S.C. § 1326, this would be a powerful argument which would require an evidentiary hearing. *United States v. Mendoza–Lopez,* —— U.S. ——, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). But once again, the validity of the deportation proceeding is not embraced within the subject-matter of this action.

■ Then there is the matter of Mr. Salgado's peaceful, productive, and uneventful life in the United States which presumably would have continued indefinitely had he not applied for Social Security benefits. Even assuming that the INS was negligent dozens, or perhaps hundreds, of times over the course of virtually two decades, that negligence accrued to defendant's benefit, and is not the sort of "affirmative misconduct" which would result in estoppel against the government.[2] Nor, for that matter, does his successful rehabilitation call into question the validity of the underlying conviction.

Having said all of that, and considering that no single factor of those arrayed above would warrant granting the relief sought, the Court is left with the unmistakable impression that under the totality of the circumstances, it would be a gross injustice to allow this man, who has by all accounts been a model resident for forty-five years save for a single period of unlawful conduct, to effectively serve a life sentence, and for his family to be deprived of benefits from a fund he has paid into throughout his working life.

As counsel were previously advised, the Court intends to do justice consonant with principles of law, and not at their expense. What are the relevant principles, and how to they dovetail with the facts at hand? Defendant suggests that the predicate point of inquiry is Rule 60(b)(6), *Federal Rules of Civil Procedure:*

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (6) any other reason justifying relief from the operation of the judgment.

■ The obvious question is what applicability a *civil* rule can have to this criminal case. There is a short answer, but before arriving at it, and at the risk of appearing to set up a strawman, an analysis of where reliance on Rule 60 might lead is in order. According to the *Notes of Advisory Committee on Rules* (1946 Amendment):

Since the rules have been in force, decisions have been rendered that the use of bills of review, coram nobis, or audita querela, to obtain relief from final judgment is still proper, and that various remedies of this kind still exist although they are not mentioned in the rules and the practice is not prescribed in the rules. It is obvious that the rules should . be complete in this regard and define the practice with respect to any existing rights or remedies to obtain relief from final judgments.

*Report of Proposed Amendments to Rules of Civil Procedure for the District Courts of the United States,* 5 F.R.D. 433, 478 (1946).

Indeed, Rule 60(b) now expressly provides that:

"[w]rits of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action."

■ It is abundantly clear that such writs were available at common law to test judgments entered in criminal actions. *See*

---

**2.** That Mr. Salgado could have numerous contacts with INS agents and come away unscathed is not surprising. After all, he had a facially valid green card. What is surprising is how he was allowed to keep that card upon being ordered deported.

*generally, United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954). But having said that much (and here is where the strawman blows apart), "Rule 60(b) applies only in civil cases." Wright & Miller, *Federal Practice and Procedure: Civil* § 2867. There is a trade-off, however, for if Rule 60 has no applicability to criminal matters, then neither can that rule serve to nullify the ancient common law writs of extraordinary relief. *Id.* While that corollary might seem self-evident, the Supreme Court has expressly so held in *Morgan, supra,* 346 U.S. at 505–07, 74 S.Ct. at 249–50 (writ of coram nobis preserved with jurisdiction founded on "All Writs Act," presently codified at 28 U.S.C. § 1651).[3]

For reasons set forth previously, the Court has a great deal of difficulty with the argument that Mr. Salgado's attorney, or the sentencing judge, committed some error mandating vacation of judgment. For the same reasons, there are no new evidential materials or theories which would serve as a "defense" to the conviction. *Coram nobis* is thus unavailable.

 *Audita querela,* however, a quaint term which has previously escaped either analysis or employment by this Court, does seem apropos under the facts of this case:

> The name of a common law writ constituting the initial process in an action brought by a judgment defendant to obtain relief against the consequences of the judgment on account of some matter of defense or discharge arising since its rendition and which could not be taken advantage of otherwise.

*Black's Law Dictionary* (5th Ed.).

That definition appears sufficiently broad to encompass the scenario presented here where Mr. Salgado seeks "relief against the *consequences* of the judgment;" and where a refusal to grant such relief would strip him of access to newly created rights which he would otherwise clearly be entitled to by operation of law.

Research discloses a grand total of one published decision in modern times which lends credence to that supposition, but in the absence of any contrary authority, one is enough:

> The writ of *audita querela* is an old common law procedure for obtaining relief from a judgment.... Rule 60(b) of the Federal Rules of Civil Procedure, in creating a procedure for relief from a final judgment in a federal civil case, expressly abolished the writ of *audita querela,* but we cannot conclude from this that the writ is unavailable in a federal criminal case. *Morgan v. United States, [sic] supra,* held that the abolition by Rule 60(b) of *coram nobis* was limited to civil proceedings; and we assume the same result would be reached if a criminal defendant could show that relief from judgment by means of *audita querela* was necessary to plug a gap in the system of federal postconviction remedies.

*United States v. Kimberlin,* 675 F.2d 866, 869 (7th Cir.1982) (citation omitted).

The *Kimberlin* Court went on to find that the petitioner before it was merely attempting to skirt the rules governing 28 U.S.C. § 2255 habeas relief and accordingly declined to construe the action as sounding in *audita querela.* The Court also expressed some wonderment that "Our research has failed to discover any criminal case in which this writ has ever been asked for; let alone issued." *Id.* at 869. The facts at bar do present such a case.

---

**3.** The term "jurisdiction" should not be taken too literally. The authorities are unanimous that only the court rendering judgment has the power to issue an extraordinary writ. Thus,

§ 1651 does not create jurisdiction, but merely allows a court to exercise continuing jurisdiction in aid of, or in supervising, its own judgments.

The newly created right at issue is the Immigration Reform and Control Act of 1986 [IRCA], codified at 8 U.S.C. § 1255a. *See generally, Gutierrez v. City of Wenatchee,* 662 F.Supp. 821, 822–24 (E.D.Wash. 1987) (overview of mechanics of Act). Mr. Salgado has been in illegal status since 1969. As nearly as can be ascertained from the record, he satisfies the essential requirements of: (1) having been a resident of the United States continuously since January 1, 1982 (§ 1255a(a)(2)(A)); (2) having been physically present in the United States since November 6, 1986 (§ 1255a(a)(3)(A)); and not being otherwise excludable *except for* the 1964 conviction. § 1255a(a)(4).

One final consideration is the length of time which has elapsed since the subject conviction. Were this matter proceeding under Rule 60(b)(6), as styled by defendant, there would be no express limits. The rule merely requires that a motion be brought within "a reasonable time." There is extreme flexibility in that concept, and the case most closely analogous to the facts at bar is *United States v. Karahalias,* 205 F.2d 331 (2nd Cir.1953).

In *Karahalias,* the petitioner had entered the United States in 1910 as a youth and was naturalized in 1927. In the interim, he had married a Greek citizen who remained in that country. In 1929 Mr. Karahalias returned to Greece to pick up his wife and settle his father's estate. In 1931 he was notified by United States authorities that his continued absence would jeopardize his status as a naturalized citizen. He contacted the American embassy and obtained a six-month extension allowing him to remain in Greece on the basis that his wife was seriously ill and could not stand the journey to the United States. He thereafter appeared at the embassy every six months and secured additional extensions on the same grounds.

Notwithstanding the apparent approval of extensions, in 1934 the authorities brought an action to declare his naturalization invalid by reason of his lengthy absence from the country. Mr. Karahalias did not respond and default was entered.

War then broke out, curtailing civilian travel, and petitioner was physically unable to return for the duration. In 1947 he did return, discovered the default judgment, and moved to set it aside.

It would be perhaps euphemistic to say that Judge Learned Hand, in drafting the *Karahalias* decision, had no difficulty in sustaining petitioner's right to so move. Indeed, one court has since characterized *Karahalias* as "a semantic tour-de-force." *McKinney v. Boyle,* 404 F.2d 632, 634 (9th Cir.1968), *cert. denied,* 394 U.S. 992, 89 S.Ct. 1481, 22 L.Ed.2d 767 (1969). Be that as it may, the decision was more than willing to cast aside technicalities and focus instead on the practical aspects: petitioner's understanding of the complaint; the futility of answering it without the realistic opportunity of defending further; the assumed fact of his wife's serious illness; and the admitted fact of his inability to return during the war; and remanded the matter for an evidentiary hearing.

While Rule 60(b)(6) is not directly applicable to the instant case, it would appear appropriate to borrow the same analysis for determining the timeliness of the subject motion. Mr. Salgado could have moved as early as 1965 when he discovered that the conviction might result in deportation. He could have moved in 1976 when *Francis, supra,* was decided. He could have moved in 1981 when the Ninth Circuit adopted the *Francis* rule. *Tapia–Acuna v. Immigration & Naturalization Service,* 640 F.2d 223, 225 (9th Cir.1981). He could have moved in 1984 when he learned that he had been in illegal status for the preceding fifteen years. He did not so move until March of 1988.

Were this a situation where an adverse party would be impacted by the twenty-four-year hiatus between judgment and the subject motion, such delay would be a weighty factor. As noted previously, however, the government has not responded to the motion, and has affirmatively represented that no objection will be interposed. Given the observation that Mr. Salgado's substantive rights under IRCA did not exist prior to November of 1986, and that

procedurally, he could not avail himself of those rights until May of 1987, the Court concludes that the ten-month delay between accrual of his IRCA rights and the bringing of the subject motion was not unreasonable under the circumstances. *Karahalias, supra.*[4]

There may be those with a more callous view of life who might conclude that Mr. Salgado has nothing to complain about. It is undisputed that he committed the crime charged, and he paid the reasonably foreseeable penalty of deportation. Some might say that his continuing enjoyment of life in the United States between 1969 and the present was a serendipitous happenstance which accrued to his benefit and which created no cognizable expectation of entitlement to remain indefinitely. The Court cannot subscribe to such a hardened approach. Much to his credit, neither can the United States Attorney. When, in the confines of this adversarial system, all counsel and the Court can unanimously agree on the equities, and on the right result, it is a fairly safe wager that justice would be served by reaching that result.

THEREFORE IT IS ORDERED that:

(1) Judgment entered herein on July 28, 1964 is VACATED.

(2) The Clerk shall enter judgment accordingly.

---

4. Lest the Court be accused of intellectual dishonesty, Mr. Salgado did not really need IRCA. But for the conviction, he would always have been entitled to immediate relative status. Even with that observation, defendant's good faith belief between 1969 and 1984 that he was legal would militate strongly in favor of excusing the delay. Moreover, there is a major substantive distinction between seeking status as an immediate relative and claiming amnesty under IRCA. In proceeding under the first, Mr. Salgado would be "standing on the shores knocking to get in." In proceeding under the latter, he would already be in the country, and could not be deported pending the disposition of his administrative claim. 8 U.S.C. § 1255(e).