785 A.2d 841

**Barry MILES**

v.

**STATE of Maryland.**

**No. 2066, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Nov. 30, 2001.

Barry Miles, Otisville, NY, for appellant.

Mary Anne Ince, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Submitted before MURPHY, C.J., CHARLES E. MOYLAN, JR., (retired, specially assigned), and RAYMOND G. THIEME, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

The subject of this appeal is the Writ of Audita Querela. The *pro se* appellant, Barry Miles, attempts to mount a belated attack on a fourteen-year-old narcotics conviction by resuscitating that ancient common law writ that, even in its lifetime, was an exclusively civil remedy and, even in that limited capacity, was characterized by the Court of Appeals one hundred fifty years ago as having, "both in England and in this country, ... fallen almost entirely into disuse." *Job v. Walker*, 3 Md. 129, 132 (1852). In Maryland, indeed, it could not even qualify as falling into disuse, having never been used in the first place. "[W]e know of no instance in Maryland where it has ever been resorted to." *Id.* Nor has it "ever been [successfully] resorted to" in the one hundred forty-nine years since 1852. Measured from our birth as an independent state, therefore, the "fall into disuse" is now three times as irretrievably deep as it was in 1852.

## The Background

On April 13, 1987, in the Circuit Court for Baltimore City, the appellant was found guilty, on his plea of guilty, of the possession of heroin with intent to distribute. Judge Edgar J. Silver gave him a two year suspended sentence with two years of supervised probation. A violation of probation warrant was issued on September 22, 1987 and was quashed on February 11, 2000.

The appellant never filed any post-trial motions. He never appealed his conviction. He never filed a petition for Post Conviction Relief. He never challenged his conviction by way of federal *habeas corpus*. The appellant is today neither in prison nor on probation in Maryland. The appellant is not even in Maryland. He is now residing in a Federal Correctional facility in Otisville, New York, where he is serving a federal prison sentence of 247 months.

The appellant sought a transfer from Otisville, New York to the Federal Correctional Institution in Oxford, Wisconsin to take advantage of a two-year Associate Degree Program in Culinary Arts offered by the University of Wisconsin. He discovered to his chagrin that his eligibility was barred by 21 United States Code, Sect. 862(a)(1)(C), which provides:

(a) Drug traffickers.

(1) Any individual who is convicted of any Federal or State offense consisting of the distribution of controlled substances shall—

. . . .

(C) upon a third or subsequent conviction for such an offense be permanently ineligible for all Federal benefits.

Because of that collateral consequence, the appellant, *in absentia*, on July 27, 2000 filed in the Circuit Court for Baltimore City a petition for a Writ of Audita Querela to vacate his 1987 conviction by Judge Silver. On October 3, 2000, the petition for a Writ of Audita Querela was denied by Judge Albert J. Matricciani. This appeal is from that denial.

In affirming Judge Matricciani, we will not consider the merits of the appellant's belated challenge to the voluntariness of his 1987 guilty plea nor will we consider the relative gravity of the collateral consequence now complained of. Our exclusive focus will be on the very existence of the Writ of Audita Querela as a modality for challenging a criminal conviction in Maryland in the year 2001.

## A Shaky Foundation

The only Maryland authority on which the appellant relies is *Skok v. State,* 124 Md.App. 226, 721 A.2d 259 (1998), reversed on other grounds by *Skok v. State,* 361 Md. 52, 760 A.2d 647 (2000). In so relying, the appellant builds on sand. The only discussion of Audita Querela in that opinion by the Court of Special Appeals is at 124 Md.App. at 230–31 n. 5, 721 A.2d 259. Significantly, nothing in that extended footnote reflects any legal conclusion whatsoever by the Court of Special Appeals. The footnote is nothing but a quotation from the appellant's petition. The footnote, moreover, begins with the express disclaimer: "According to appellant's petition for a writ of *Audita Querela:* "

Although that quotation, to be sure, cites some of the important landmarks in Maryland's references over the years to Audita Querela, several of its key conclusions as to Maryland law are flatly wrong. It cites *Job v. Walker* for the proposition that "The ancient common law Writ of Audita Querela exists [in] Maryland common law." The actual conclusion of *Job v. Walker,* however, is that the writ probably no longer exists, if, indeed, it ever existed in Maryland. The quotation goes on to assert that "although the Writ of Audita Querela has fallen into disuse, it is still available." The post–1852 Maryland case law, quite to the contrary, repeatedly states that the writ is no longer available, if, indeed, it ever was. The appellant builds on a shaky foundation. Notwithstanding that it contains a few good leads for further research, that quotation from Skok's petition is no authority for anything.

## What Is Audita Querela?

Though sounding like a mellifluous name for a Byzantine courtesan, "Audita Querela" is actually Law Latin for "having heard the quarrel (or complaint)." *Black's Law Dictionary* (7th ed.1999) defines it as:

A writ available to a judgment debtor who seeks a rehearing of a matter on grounds of newly discovered evidence or newly existing legal defenses.

*Job v. Walker* in 1852 referred to the use of Audita Querela simply as an "ancient practice," 3 Md. at 132. L.B. Curzon, *English Legal History* 103 (2d ed.1979), however, attributes its introduction into equity practice to the reign of Edward III (1327–1377). Curzon explains that the Writ of Audita Querela

"... was available to re-open a judgment in certain circumstances. It was issued as a remedy to defendant where an important matter concerning his case had arisen since the judgment. Its issue was based on equitable, rather than common law principles."

Although reading Nineteenth Century judicial opinions plumbing the depths of common law pleading and procedure is an experience not unlike reading *Beowulf* in the original Old Saxon, certain salient characteristics do emerge from the otherwise incomprehensible muddle. The Writ of Audita Querela was exclusively a civil remedy. It was, moreover, a remedy available only in equity. It was a post-final-judgment remedy; it did not challenge the validity of the original final judgment itself. It was in that regard that it was distinguished from the Writ of Coram Nobis, which did challenge the validity of the original judgment. 7A *Corpus Juris Secondum, Audita Querela,* Sect. 2, at 901 (1980) explains this critical difference:

"Audita querela is distinguished from coram nobis in that *coram nobis attacks the judgment itself, whereas audita querela may be directed against the enforcement, or further enforcement, of a judgment* which when rendered was just and unimpeachable."

(Emphasis supplied).

The Writ of Audita Querela sought to bar the enforcement or execution of an otherwise valid judgment because of some subsequent event that rendered the enforcement or further enforcement of the judgment inequitable. A simple example would be where the judgment had been paid or otherwise discharged but the payment or discharge was not reflected in the record. Such a circumstance would render the further execution of the judgment self-evidently inequitable.

We are not alone in finding the subject, despite its antiquarian charm, a bit murky. In *Klapprott v. United States,* 335 U.S. 601, 614, 69 S.Ct. 384, 93 L.Ed. 266 (1949), the Supreme Court observed that "few courts ever have agreed as to what circumstances would justify relief under these old remedies" and referred to "the uncertain boundaries of these and other common law remedial tools."

Although the pre-Civil War languishing into desuetude of Audita Querela in Maryland obviously did not depend on the *coup de grace* administered to the writ by the amendment to Federal Rule of Civil Procedure 60(b) in 1948, the learned commentary on that 1948 amendment also sheds light on our confrontation with this ghost from auld lang syne. As amended in 1948, Rule 60(b) now provides in part that "writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review are abolished."

With refreshing candor, 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* (2d ed.1995), Sect. 2867, p. 393, welcomed the abolition as a deliverance from obscurity:

> *Few* except legal historians *will understand* clearly what it is that was abolished, *but those who do understand are grateful for what was done.*
>
>> In its present form, 60(b) is a response to *the plaintive cries of parties who have for centuries floundered, and often succumbed, among the snares and pitfalls of the ancillary common law and equitable remedies.* [Quoting from *Bankers Mortgage Co. v. United States,* 423 F.2d 73, 77 (5th Cir.1970) ].
>
> At common law and in equity there were a variety of procedural devices for seeking relief from a judgment but, as the Advisory Committee said in proposing the 1948 amendment, *the precise relief obtained* in a particular case *by use of those remedies was "shrouded in ancient lore and mystery."*

(Emphasis supplied).

The authors explained, at 393, how Coram Nobis was an attack on the judgment itself.

"Coram nobis" was the name of an ancient common law writ of error applied for in a subsequent term of the court that gave judgment and sought to have the judgment revoked for errors of fact not apparent on the record. "Coram vobis" was, for present purposes, another name for the same writ.[1]

Audita Querela, by contrast, was relief from the *execution* of a judgment because of some post-judgment development.

"Audita querela" was a common law writ to afford relief to a judgment debtor against a judgment or execution because of some defense or discharge arising subsequent to the rendition of the judgment or the issue of the execution.

*Id.* at 393–94.

The authors finally pointed out that because Rule 60(b) applied only in civil cases, it necessarily had no effect on the continuing viability in the criminal courts of a writ such as Coram Nobis, which applied to criminal cases. The other common law remedial writs, by contrast, apparently had no applicability to criminal cases.

Rule 60(b) applies only in civil cases. The old writ of error coram nobis remains available in a criminal case as a means to challenge a conviction by one who has completed service of his sentence. But in civil cases, the five ancient devices listed in Rule 60(b) no longer are available and relief from a judgment only can be obtained by motion under the rule or by an independent action.

*Id.* at 394–95.

## Audita Querela in Maryland

It is conceivable that a Writ of Audita Querela was the appropriate relief sought in 1718 in the case of *Docura v. Henry,* 4 H. & McH. 480 (1718), but the cryptic opinion of the Court of Appeals sheds no light on it. The full opinion of the Court recited simply:

---

1. The name "coram nobis" was used in the Court of King's Bench while "coram vobis" was the name in the Court of Common Pleas.

JUDGMENT, that the plaintiff take nothing by his writ of *audita querela.*

In *Morgan's Lessee v. Davis,* 2 H. & McH. 9, 15 (1781), Audita Querela was mentioned in *dicta.* *Beatty's Adm'rs. v. Chapline,* 2 H. & J. 7 (1806), did not even remotely deal with Audita Querela. Judge Gantt, one of four judges writing an opinion in the case, however, by way of passing *dicta* on an issue not before the Court, observed, "A writ of audita querela, or a bill of injunction, in ordinary cases, will remedy any inequity in the judgment itself, or in issuing or completing the execution." *Id.* at 33.

Whatever the juridical lay of the land may have been in 1718 or in 1806, the Writ of Audita Querela was clearly over the hill by the time the Court of Appeals next mentioned it in *Job v. Walker,* 3 Md. 129, in 1852. A judgment for $500 and costs had been entered against Job for a debt he owed to Walker. Prior to its being executed, however, Job claimed credit against the judgment for $337 he had paid to Walker "with the express understanding that they were to be applied towards this judgment."

The Court of Appeals held that relief of the sort sought might be appropriate by way of a direct and simple motion to the court. It explained that the "ancient practice" would have been by a Writ of Audita Querela but that the common law formality of resorting to such a writ had fallen into disuse and had been displaced by the more informal practice of a direct motion to the court that had entered the judgment.

The ancient practice in a case like the present, was by **audita querela.** Blackstone in his *Commentaries,* (3 *vol., page* 405,) says: "An **audita querela** is where a defendant, against whom a judgment is recovered, and who is therefore in danger of execution, or, perhaps, actually in execution, may be relieved upon good matter of discharge which has happened since the judgment, as if the defendant hath paid the debt to the plaintiff without procuring satisfaction to be entered on the record." In latter years, this proceeding, both in England and in this country, has fallen almost

entirely into disuse. Indeed we know of no instance in Maryland where it has ever been resorted to. In 1 *Box. and Pul.*, 428, Chief Justice Eyre says: "I take it to be the modern practice, to interpose, in a summary way, in all cases where the party would be entitled to relief on an **audita querela.**" And in 4 Burr. 2287, it is asserted as a general rule, that the courts will not put the defendant to the trouble and expense of an **audita querela,** but will receive him in a summary way on motion.

3 Md. at 132.

Over the next forty-two years, the phrase "audita querela" was mentioned by the Court of Appeals on five occasions, each time only by way of the briefest of passing *dicta* in opinions dealing with some other form of relief and only in civil cases. On four of the five occasions, moreover, the *dicta* reconfirmed Audita Querela's obituary notice. *Huston v. Ditto,* 20 Md. 305, 331 (1863) ("The *audita querela* is said to be superseded in this State by motion."); *Seevers v. Clement,* 28 Md. 426, 436 (1868); *Starr v. Heckart,* 32 Md. 267, 272 (1870) ("To a judgment ... rendered under such circumstances, a party would undoubtedly be entitled to relief, by an *audita querela* at common law, or by summary judgment according to the practice in this State."); *Gorsuch v. Thomas,* 57 Md. 334, 339 (1882) ("Formerly such relief was obtained by *audita querela,* but in modern practice it is obtained in a more summary way by motion."); *Jones v. George,* 80 Md. 294, 299, 30 A. 635 (1894) ("The *audita querela* has been superseded in modern practice by motion to the Court."). 1 John Prentiss Poe, *Pleading and Practice* (3d ed 1897), Sect. 115, at 104 n. 2, closed out the Nineteenth Century by noting, "*Audita querela* is now superseded by motion."

After the passing notice in *Jones v. George* in 1894, the Writ of Audita Querela lay quiescent for over one hundred years. Neither at the common law nor in Maryland, moreover, had it ever been remotely suggested that Audita Querela could ever be invoked in a criminal court. It was exclusively a writ brought in an equity court to bar the execution of a judgment that had been entered in a law court. Even on the civil side,

the writ, albeit sometimes referred to, had never actually been granted in Maryland, at least as far as appellate notice might reveal. From 1852 onward, moreover, every Maryland notice of Audita Querela was simply to the effect that it was an "ancient common law practice" that had "fallen into disuse" and had been "superseded."

### A Tale From the Crypt

It was, therefore, from a long untended mausoleum that Audita Querela was eerily summoned back to life in *Skok v. State,* 124 Md.App. 226, 721 A.2d 259 (1998). As it emerged from its century-long sleep, moreover, Audita Querela had somehow shaken loose its ancient chains of equity and of civil procedure as it appeared for the first time in Maryland history in a criminal court. The ghost there enjoyed a distinct advantage. In a strange new world where no one could remember what Audita Querela was, neither could anyone remember its limitations. Its very unfamiliarity gave it potentially protean adaptability. A few out-of-context sentences from archaic opinions seemed to invest it with remarkable potency.

The trial judge, however, denied all relief and Skok appealed. Neither the Court of Special Appeals in *Skok v. State,* 124 Md.App. 226, 721 A.2d 259, nor the Court of Appeals in *Skok v. State,* 361 Md. 52, 760 A.2d 647 (2000), was ultimately called upon to rule on Audita Querela, for Skok abandoned on appeal any challenge to the denial of that writ. Indeed, Skok's primary reliance throughout both the trial and the appeals was on the Writ of Coram Nobis, with Audita Querela trailing behind as little more than an ancillary afterthought. Both appellate courts took notice of Audita Querela, however, by way of extended footnotes. The Court of Special Appeals footnote, 124 Md.App. at 230–31 n. 5, 721 A.2d 259, was, as previously noted, nothing more than a quotation from Skok's original trial court petition for the writ. The Court of Appeals footnote, by contrast, spoke for the Court, 361 Md. at 58–59 n. 2, 760 A.2d 647.

That Court of Appeals footnote, by Judge Eldridge, was a very thorough collection of both early Maryland and modern federal references to Audita Querela. The footnote concluded, however, that because Skok had abandoned his appeal on that issue, the Court of Appeals did not need to "express any opinion upon the matters discussed in the above-cited case." *Id.*

## A Possible Metamorphosis
## In Federal Criminal Court

The modern federal cases collected in that footnote do raise an intriguing question. Has the ancient equitable writ, a century and a half after its demise, been reincarnated? If so, has it, in the course of that reincarnation, been metamorphosed from a limited civil procedure into a vehicle for challenging criminal convictions?

The discernible tone of the footnote and the collective logic of the federal cases cited therein strongly indicate that the answer to that question should be a resounding "No." Two federal district court cases, both from 1988, however, suffice at least to raise the question. The very existence of those cases, moreover, explains why this dusty relic from the crumbling pages of Blackstone's *Commentaries* has found sudden favor with resourceful and inventive criminal defense attorneys and defendants.

The twin culprits in this case of doctrinal grave robbing are *United States v. Salgado,* 692 F.Supp. 1265 (E.D.Wash.1988) and *United States v. Ghebreziabher,* 701 F.Supp. 115 (E.D.La. 1988). Both, on their facts, were hard cases and they show the tell-tale scars.

Salgado had been in the United States legally for 45 years and had been married to an American citizen for 41 years. For the last 25 years he had enjoyed an unblemished record when he was denied newly created rights under the Immigration Reform and Control Act, denied Social Security benefits, and faced with deportation because of a 24–year–old conviction for a minor criminal offense. Under Federal Rule of Civil

Procedure 60(b)(6), Salgado sought to set aside that conviction because of these previously unforeseen collateral consequences. Because "the equities militate strongly in [his] favor," 692 F.Supp. at 1266, the United States Attorney's Office did not oppose Salgado's petition for relief.

Although recognizing a number of procedural impediments to granting the relief sought, the trial judge could not ignore the compelling factual circumstances:

> [T]he Court is left with the unmistakable impression that under the totality of the circumstances, it would be a gross injustice to allow this man, who has by all accounts been a model resident for forty-five years save for a single period of unlawful conduct, to effectively serve a life sentence, and for his family to be deprived of benefits from a fund he has paid into throughout his working life.

*Id.* at 1268.

In groping for some way to provide relief, the judge was first compelled to forego any reliance on Coram Nobis.

> [T]he Court has a great deal of difficulty with the argument that Mr. Salgado's attorney, or the sentencing judge, committed some error mandating vacation of judgment. For the same reasons, there are no new evidential materials or theories which would serve as a "defense" to the conviction. *Coram nobis* is thus unavailable.

*Id.* at 1269. Audita Querela, by contrast, in part because of the court's apparent unfamiliarity with it, showed more promise:

> *Audita querela,* however, *a quaint term which has previously escaped either analysis or employment by this Court,* does seem apropos under the facts of this case.

*Id.* (emphasis supplied). The judge then quoted a definition of "audita querela" that did not mention that it was a writ in equity to bar the execution of a civil judgment and, thus, unconfined, concluded: "That definition appears sufficiently broad to encompass the scenario presented here." *Id.* The court was obviously straining to reach a desired result.

The judge then faced the daunting task of showing that Audita Querela was a remedy available in the criminal court. He failed utterly to do so. The attempt to do so was a glaring non-sequitur. The judge simply asserted that FRCP 60(b) did not prohibit the use of Audita Querela in the criminal court. Of course, it did not, but what follows from that? It did not prohibit the use of anything in the criminal court; it had nothing to do with the criminal court. It did not, for instance, prohibit the use of Hammurabi's Code or the Code Napoleon in the criminal court. That self-evidently does not imply that Hammurabi's Code or the Code Napoleon are thereby permitted in the criminal court. That the forms of the common law actions have been eliminated *from civil practice* does not, *ipso facto*, imply that they are therefore permitted in criminal practice. The *Salgado* Court's flawed logic was: "If a particular provision does not forbid something, the thing not so forbidden must, therefore, be permitted."

The court first quoted Rule 60(b):

"writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action."

*Id.* at 1268. The judge then made an unjustified equation of Audita Querela and Coram Nobis. He cited *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), for the proposition that, notwithstanding its elimination from civil practice, Coram Nobis is still a viable form of relief in criminal practice. Coram Nobis, however, was historically available in civil court and criminal court alike, whereas Audita Querela, by contrast, was only available in civil practice. The continuing vitality of Coram Nobis in criminal practice, therefore, establishes nothing with respect to Audita Querela, which never applied to criminal practice in the first place. The *Morgan* case never mentioned Audita Querela or any of the other writs covered by Rule 60(b) other than Coram Nobis. Based only on *United States v. Morgan*, which held no such

thing, the *Salgado* court erroneously universalized as to all writs from the particular instance of Coram Nobis:

It is abundantly clear that such writs were available at common law to test judgments entered in criminal actions.

692 F.Supp. at 1268.

Aware that its "supposition" rested on shaky grounds, the *Salgado* Court strained to find some support:

Research discloses a grand total of one published decision in modern times which lends credence to that supposition, but in the absence of any contrary authority, one is enough.

*Id.* at 1269. The case looked to was *United States v. Kimberlin*, 675 F.2d 866 (7th Cir.1982).

The *Kimberlin* opinion, however, does not provide the support sought. It stated, to be sure:

Rule 60(b) of the Federal Rules of Civil Procedure, in creating a procedure for relief from a final judgment in a federal civil case, expressly abolished the writ of audita querela, but we cannot conclude from this that the writ is unavailable in a federal criminal case.

675 F.2d at 869. It went on to state that if Audita Querela were shown to have been available, like Coram Nobis, in the criminal court, it would continue to be available, unaffected by a change in the civil rules. As to such availability, however, *Kimberlin* was very skeptical:

[I]t is very doubtful that audita querela would be the means to fill [a gap in the system of post conviction remedies]. *Our research has failed to discover any criminal case in which this writ has ever been asked for, let alone issued; it appears to be primarily a remedy of judgment debtors.* See 11 Wright & Miller, Federal Practice and Procedure 235 (1973).

*Id.* (emphasis supplied).

The *Salgado* Court's conclusion is unabashedly result-oriented. If the Writ of Audita Querela is necessary to prevent an injustice, it must be available.

The Court cannot subscribe to such a hardened approach. Much to his credit, neither can the United States Attorney.

When, in the confines of this adversarial system, all counsel and the Court can unanimously agree on the equities, and on the right result, it is a *fairly* safe wager that justice would be served by reaching that result.

692 F.Supp. at 1271 (emphasis supplied). It is an argument from necessity. The use of the qualifying adverb "fairly" seems to betray some inner qualms.

*United States v. Ghebreziabher* was not so much a second arrow in the quiver as a vibration from the release of the first. The petitioner sought by a Writ of Audita Querela to have one of three contemporaneous one-year-old guilty pleas vacated. He had originally entered pleas to three counts of accepting food stamps, of a total value of $220, when not authorized to do so. Because he had *three* convictions, instead of two, he was thereby not eligible for amnesty under the Immigration Reform and Control Act of 1986 and was facing deportation to Ethiopia. His plight, because of a relatively trivial offense, was as heart-rending as that in *United States v. Salgado.*

Mr. Ghebreziabher has been an industrious member of this community for almost ten years. He has four United States citizen children who will be deprived of his support if he should be deported. He has realized the American dream, owning his own home, and has reduced the mortgage on it from $58,500.00 to $33,000.00 in approximately 6 years. Except for these 3 incidents, he has no convictions. His former employer, a subsidiary of a shipyard where he worked as a carpenter and joiner, thought well of him and found him to be hard-working. The political climate of Ethiopia is another consideration. The State Department has designated Ethiopia as a country of voluntary departure since 1982 due to its internal strife. Since the defendant had to escape from the country initially, the future for Mr. Ghebreziabher there appears to be foreboding. It is also likely that his family will suffer tremendously should he be deported and removed from the home.

701 F.Supp. at 117.

With almost no legal analysis and citing only *United States v. Salgado* as authority, the district court vacated one of the

guilty pleas pursuant to the Writ of Audita Querela. The result was obviously an equitable one and the district court reasoned that its disposition "would serve the interests of justice and not in any way prejudice the United States." *Id.* The unasked and unanswered question was: "Does the end justify the means?" The second and related question was: "Even if it does, is the appropriate label for such a latter-day, necessity-based, and open ended 'means to an end' the name of an ancient common law writ once available in equity court for a judgment debtor?"

The case of *United States v. Acholonu,* 717 F.Supp. 709 (D.Nev.1989), one year later, actually cuts both ways. It was also a case involving immigration difficulties because of an earlier criminal conviction. Acholonu had plead guilty nine years earlier to the felony of mail fraud. Although the petitioner "appear[ed] to have been a model citizen since his conviction," had "obtained a master's degree in metallurgical engineering and completed the course work towards a doctorate," and was "now gainfully employed as a chemist," 717 F.Supp. at 711, he was ineligible for amnesty under the Immigration Reform and Control Act and would be barred from obtaining United States citizenship. *Id.* at 710. He petitioned for a Writ of Audita Querela to vacate his mail fraud conviction.

On the exclusive authority of *United States v. Salgado* and *United States v. Ghebreziabher,* the court ruled, as an abstract proposition, that Audita Querela was available in criminal cases. In looking then more closely at Audita Querela than the earlier two cases had done, the court further ruled that stern collateral consequences are not themselves sufficient reason to invalidate a judgment of conviction.

After pointing out that the "classic example of a discharge which gives rise to audita querela relief is the case of a judgment debtor who obtains a discharge of the debt in bankruptcy," *id.* at 710, the court concluded that "it would be a non-sequitur to say that [the ineligibility for amnesty provision] constitutes a discharge of defendant's conviction since

[that law] specifically provides that a felony conviction disqualifies an alien from the amnesty program." *Id.*

By the same token, the harshness of the collateral consequence did not constitute a "defense" to the conviction.

Similarly, passage of the IRCA amnesty provision is not a defense to defendant's conviction because it is irrelevant to the substantive law and facts upon which defendant was convicted. An increase in the collateral consequences of a conviction might affect the sentence a defendant receives, but does not go to the merits of the offense charged. Thus, even if we had known that defendant's conviction would ultimately prevent him from obtaining U.S. citizenship through an amnesty program, the Court would not have dismissed the indictment on that basis.

*Id.* Audita Querela relief was denied:

Thus, while the Court is gratified by defendant's successful rehabilitation, we conclude that even though it may justify many other things, it does not justify a writ of *audita querela.*

*Id.* at 711.

### A Federal Correction of Course

In *United States v. Grajeda–Perez,* 727 F.Supp. 1374 (E.D.Wash.1989), the United States District Court for the Eastern District of Washington, the very court that had issued the *Salgado* opinion thirteen months earlier, fine-tuned its analysis. In another immigration case, the court agreed that relief generally was appropriate under the "wide latitude" of the All–Writs Act. It was very explicit, however, that that was not the same thing as relief pursuant to a Writ of Audita Querela.

Recently, some courts, when confronted with this very situation, have relied alternatively on the writ of *audita querela* as the means used to accomplish the same result. However, *this likewise appears to be inappropriate, as audita querela traditionally has been used only to obtain*

> *relief from the consequences of a judgment, whereas here the remedy sought is vacation of the judgment itself.*

727 F.Supp. at 1375 (emphasis supplied).

*United States v. Garcia–Hernandez,* 755 F.Supp. 232 (C.D.Ill.1991), was another case in which immigration-related consequences resulted from a criminal conviction. In denying a petition for a Writ of Audita Querela, the court expressly disagreed with the reasoning of *United States v. Salgado* and its progeny.

> *This Court must disagree with United States v. Salgado, United States v. Ghebreziabher, and United States v. Grajeda–Perez.*

> *Salgado is founded on a highly questionable interpretation of United States v. Kimberlin. Kimberlin* indicates only that *Fed.R.Civ.P. 60(b) does not necessarily eliminate the availability of writs of audita querela in criminal cases, although the court was unaware of any case in which such relief had been sought or granted in a criminal case.* The *Kimberlin* court suggested such relief might be appropriate if there was a gap in the existing post-conviction remedies, which the court doubted. The court further stated that *"even if there were such a gap, it is very doubtful that audita querela would be the means to fill it."*

> The "gap" in the available post-conviction remedies that *Salgado, Ghebreziabher* and *Grajeda–Perez* have all addressed is the court's lack of a means to "remedy" a totally valid conviction (i.e., a conviction that is in no way legally defective) when the court dislikes the collateral effect of the conviction under IRCA. The only possible inequity in these cases is the harsh consequences criminal convictions have under laws passed by Congress.

> *We do not believe Kimberlin intended to leave open the writ of audita querela as a means for the courts to circumvent the application of laws they considered inequitable.*

755 F.Supp. at 235 (emphasis supplied). *See also United States v. Javanmard,* 767 F.Supp. 1109, 1111 (D.Kan.1991); *Townsend v. United States,* 38 F.Supp.2d 424 (D.Md.1999).

Beginning in 1990, the United States Circuit Courts of Appeals for six circuits have considered the Writ of Audita Querela as a means of challenging a criminal conviction. All six have squarely rejected the analysis and the holdings of *United States v. Salgado* and *United States v. Ghebreziabher.* All six, incidentally, were cases in which the collateral consequences of a criminal conviction involved immigration status.

*United States v. Ayala,* 894 F.2d 425 (D.C.Cir.1990), denied relief to a petitioner who sought to vacate a criminal conviction by a Writ of Audita Querela. Ayala claimed both 1) that deportation was an inequitably harsh consequence and 2) that a false promise by immigration authorities rendered his guilty plea involuntary. The second claim went directly to the validity of the judgment of conviction and with respect to such a claim the court observed:

> The only circumstance, if any, in which the writ could furnish a basis for vacating a criminal conviction would be if the defendant raised a legal objection not cognizable under the existing scheme of federal postconviction remedies.

894 F.2d at 426.

Because a challenge to the voluntariness of a guilty plea would be cognizable 1) under a federal post-conviction petition, if the petitioner were still in custody; or 2) under a Writ of Coram Nobis, if he were no longer in custody, there was no gap in the cognizable legal remedies that needed to be filled by Audita Querela.

> [B]ecause under modern federal practice, a defendant may, under appropriate circumstances, rely on a postjudgment contingency to attack the lawfulness of his conviction in a section 2255 or a *coram nobis* proceeding, *the traditional writ of audita querela adds nothing to these two forms of relief.*

894 F.2d at 429 (emphasis supplied). Under the circumstances, Audita Querela was not available as a remedy.

> At least under the circumstances presented by this appeal, we hold that *audita querela has been* similarly *superseded in federal criminal practice* by 28 U.S.C. § 2255 and the

writ of *coram nobis,* the conventional postconviction remedies available to criminal defendants.

894 F.2d at 427 (emphasis supplied).

Turning to the theory of equitable relief championed by *United States v. Salgado,* the court rejected the *Salgado* reasoning as "mistaken."

> *The Salgado and Ghebreziabher courts appear mistaken,* as a historical matter, in their conclusion that *audita querela* furnishes a purely "equitable" basis for relief independent of any legal effect in the underlying judgment. Commentators and jurists since the time of Blackstone have emphasized the need to show a postjudgment contingency supplying a "matter of discharge" or "defense."

894 F.2d at 429 (emphasis supplied). The court rejected especially the "redefining of the common law" simply to fill an equitable need.

> We recognize that the "pure equity" variant of *audita querela,* endorsed by *Salgado* and *Ghebreziabher,* purports to add a new remedy in the federal postconviction remedial scheme. However, *we do not believe that the "gap filling" allowed by Morgan permits a court to redefine a common law writ in order to create relief not otherwise available* in the federal postconviction remedial scheme.

894 F.2d at 429 (emphasis supplied).

Within the year, the First Circuit in *United States v. Holder,* 936 F.2d 1 (1st Cir.1991), followed the District of Columbia Circuit in rejecting the *Salgado–Ghebreziabher* vision of Audita Querela. Once again, adverse immigration law consequences had followed from a sixteen-year-old conviction for importing marijuana. Holder petitioned for a Writ of Audita Querela to vacate that conviction.

The *Holder* Court was sympathetic, 936 F.2d at 3, to what the *Salgado* court had felt a need to do.

> It is fairly evident from the court's opinion in *Salgado* that the equities of that case motivated that court to find some

authority pursuant to which it could render what even the government in that case perceived as the just result.

It nonetheless concluded that *Salgado* had "ignored" legal requirements in straining to reach a result.

> With respect, we believe that *the Salgado court, in seeking to do justice, nonetheless ignored that part of the definition of audita querela which requires the showing of "some matter of defense or discharge,"* i.e., a legal defect in the conviction, arising since the conviction. In so doing, that court also added the equitable consideration of whether "a refusal to grant such relief would strip him of access to newly created rights which he would otherwise clearly be entitled to by operation of law." It found a newly created right in the amnesty provisions of the Immigration Reform and Control Act of 1986.... The *Salgado* case was the first, it appears, in which a criminal conviction was vacated pursuant to a writ of *audita querela.*

936 F.2d at 3–4 (emphasis supplied). *Holder* held that in the absence of "a legal objection to a conviction which had arisen subsequent to that conviction," Audita Querela was not available as relief.

> We agree with the *Ayala* and *Garcia–Hernandez* courts that, *if available at all, the writ of audita querela can only be available where there is a legal objection to a conviction, which has arisen subsequent to that conviction,* and which is not redressable pursuant to another post-conviction remedy. Not only is this view truer to the definition of this writ, it respects the proper interest of the legislative branch in defining the beneficiaries of its laws and of the executive branch in maintaining the integrity of convictions lawfully obtained.... [P]etitioner could not be entitled to the writ here, as he points to nothing occurring since his conviction that would render his conviction illegal.

936 F.2d at 5 (emphasis supplied).

In that same year, the Fifth Circuit joined the chorus of circuits rejecting *Salgado* with its opinion in *United States v. Reyes,* 945 F.2d 862 (5th Cir.1991), also a case in which

deportation was being threatened. Reyes sought a Writ of Audita Querela to attack the "unjustly harsh consequence of his conviction." 945 F.2d at 863. The Fifth Circuit flirted with declaring Audita Querela absolutely dead as a remedy in criminal court but ultimately decided the case before it on less sweeping grounds.

> *Three circuits have now questioned,* without deciding, *whether audita querela is ever available to vacate an otherwise final criminal conviction. We have similar doubts,* but for present purposes we assume, without deciding, that in some set of circumstances *audita querela* might appropriately afford post-conviction relief to a criminal defendant.

945 F.2d at 865 (emphasis supplied).

*Reyes* recognized that the notion of using Audita Querela to provide equitable relief from overly harsh collateral consequences was the exclusive brainchild of *Salgado* and *Ghebreziabher.*

> Reyes' legal argument relies primarily on two district court cases which have found the writ *audita querela* appropriate to provide equitable relief where a foreign national seeks adjustment of status under section 245A of the Immigration Reform and Control Act of 1986. *See United States v. Salgado, United States v. Ghebreziabher.*

945 F.2d at 865–66. After pointing out that two other circuits had rejected the reasoning of those cases, the Fifth Circuit elaborated on why such judicial freewheeling, no matter how nobly motivated, is unwarranted.

> [A]llowing a writ of *audita querela* to vacate a conviction on the purely equitable grounds that Reyes argues "purports to add a new remedy in the federal postconviction remedial scheme." *Id. There seems to be no adequate statutory or historical warrant to authorize federal courts to grant such relief.* Moreover, allowance of such an equitable remedy does not properly account for separation-of-powers concerns.
>
> When a court vacates an otherwise final conviction because the defendant faces deportation, the court tends to usurp

the power of Congress to set naturalization and deportation standards and the power of the INS to administer those standards in each individual case, as well as the power of the executive to prosecute criminal offenses. Similarly, in such instances the "pure equity" version of *audita querela* to some extent trenches upon the power and discretion of the President to pardon. *Absent a clearer statutory or historical basis, an article III court should not arrogate such power unto itself. We, too, operate under the law.* Reyes' argument that it is unfair to deport him solely on the basis of an isolated conviction properly belongs to other fora, not the courts.

945 F.2d at 866 (emphasis supplied). *See also United States v. Banda*, 1 F.3d 354, 356 (5th Cir.1993) (observing that Audita Querela "is a slender reed upon which to lean" and that "[i]t is an open question whether the obsolescent writ survives as post-conviction remedy").

The Seventh Circuit enlisted in the anti-*Salgado* movement with *United States v. Johnson*, 962 F.2d 579 (7th Cir.1992), another deportation case. The court declined to administer to Audita Querela an absolute *coup de grace.*

While we continue to question the extent of the viability of *audita querela* given the availability of *coram nobis* and § 2255, we decline the invitation to finally resolve the tension between outright abolition and the possibility of that one case where a writ of *audita querela* is precisely the relief merited.

962 F.2d at 583. It nonetheless foreclosed the use of Audita Querela to vacate criminal convictions because of harsh collateral consequences.

[A] claim that a criminal conviction is inequitable or unfair, or even grossly unfair, does not constitute a defense to, or discharge from, that conviction. *Audita querela is not a wand which may be waved over an otherwise valid criminal conviction, causing its disappearance;* rather, it provides relief from the consequences of a conviction when a defense or discharge arises subsequent to entry of the final

judgment. The defense or discharge must be a legal defect in the conviction, or in the sentence which taints the conviction. *Equities or gross injustice, in themselves, will not satisfy the legal objection requirement and will not provide a basis for relief.*

962 F.2d at 582 (emphasis supplied).

The Second Circuit joined the ranks in 1995 with *United States v. LaPlante,* 57 F.3d 252 (2d Cir.1995), also a deportation case. The analysis was very brief but the court did observe:

Audita querela is probably available where there is a legal, as contrasted with an equitable, objection to a conviction that has arisen subsequent to the conviction and that is not redressable pursuant to another post-conviction remedy. ... Nothing has occurred subsequent to the conviction that remotely creates a legal objection to the conviction, such as might be redressable by a writ of audita querela.

57 F.3d at 253.

The Ninth Circuit came aboard with *Doe v. Immigration and Naturalization Service,* 120 F.3d 200 (9th Cir.1997), a case where the district court found as a fact that Doe "will be killed or physically harmed if deported to the Republic of Mexico due to his past participation with the Drug Enforcement Administration." 120 F.3d at 202. The district court had granted Doe relief pursuant to Audita Querela because of the extreme exigency of the situation.

In reversing, the Ninth Circuit joined the other circuits in rejecting the reasoning of *Salgado* and *Ghebreziabher.*

*The Salgado and Ghebreziabher courts,* we agree with each of our sister circuits to address the issue, *misconstrued the scope of the writ.*

At common law *audita querela* was available only to relieve a judgment debtor where a legal defense or discharge arose subsequent to the judgment.

120 F.3d at 203 (emphasis supplied). The court concluded, *id.* at 204:

[W]e now expressly join our sister circuits in holding that a writ of *audita querela, if it survives at all,* is available only if a defendant has a legal defense or discharge to the underlying judgment.

(Emphasis supplied).

The appellant's reliance on *United States v. Salgado* is, in the last analysis, as calamitous as his reliance on footnote 5 of *Skok v. State,* 124 Md.App. at 230–31, 721 A.2d 259.

### A False Light On The Shore

The appellant's reliance of *United States v. Salgado* is, moreover, doubly treacherous. Because a federal district court, desperate to save a deserving long-time resident from a cruel deportation, dug up a juridical fossil and attempted to breathe life into it, is no reason for Maryland to follow that lead. The Eastern District of Washington was as legally wrong as it was compassionate. With respect to the Writ of Audita Querela, Maryland, we hold, does not follow federal law generally. *A fortiori,* it does not follow *Salgado* specifically.

Even if we were, *arguendo,* applying federal law to this case, the appellant's appeal to Audita Querela would still be feckless. The appellant's challenge is to the voluntariness of his 1987 guilty plea. He could have appealed that conviction on the grounds he now raises, but did not. Even as an afterthought after becoming aware of unforeseen collateral consequences, he could have raised the challenge by way of a Post Conviction Petition if he were still in custody in Maryland or on probation. Lacking such Maryland restraints, he could have petitioned for a Writ of Coram Nobis. Between those two, there would be no gap in the available post-conviction remedies for Audita Querela to fill, even by the most permissive of federal interpretations.

### Requiescat in Pace

■ We turn now exclusively to Maryland law, unaffected by federal practice. Even on the civil side, the Writ of Audita Querela, if it were ever alive, has been dead in Maryland since at least 1852. *Job v. Walker, supra.* It has been replaced by

a simple motion, whenever such motion would be appropriate, to the court that rendered the judgment.

Even when arguably alive, moreover, Audita Querela was never an attack on the judgment itself (such as the appellant's challenge here to the voluntariness of his 1987 guilty plea) but only a bar to the inequitable enforcement or execution of the judgment based on some new post-judgment development. All of the circumstances surrounding the guilty plea of which the appellant now complains were pre-judgment, not post-judgment, events. Even if the appellant could get over the problem of the civil-criminal dichotomy, moreover, the proper analogue to barring the arguably harsh enforcement of a judgment would seem to be a motion in federal court to countermand the withholding of the appellant's federal benefits, not a rewriting of history by seeking in a Maryland court to abrogate the judgment itself. We are not the source of the objectionable sanction.

More pertinently, the Writ of Audita Querela has never applied in a criminal court in this state. In light of its Blackstonian definition and purpose, it was never suggested in the history of this colony or state that it could ever have any applicability to a criminal case. Judge Matricciani was correct in denying the appellant's petition for the issuance of a non-existent writ.

### A Writ By Any Other Name . . .

■ Hypothetically, the appellant might ultimately respond, "Call my request, if you insist, a simple informal motion instead of a petition for a Writ of Audita Querela, but give me what I deserve without obsessing unduly over the title of the request."

There would be a rustic commonsense appeal in that response. A prime reason, after all, why the federal courts are hesitant to pronounce the common law writs, other than Coram Nobis, irrevocably dead rather than only moribund is that almost everything that once could be accomplished by the common law writs can still be accomplished by direct and less formal motions. A writ is not dead if it is living under another

name. Could not the appellant's formal request for relief in this case, therefore, be entertained simply as a less formal motion to the same end?

The foreclosing response is that Maryland in this regard is far less relaxed than is the federal government. As Judge Cole analyzed for the Court of Appeals in *Andresen v. Andresen,* 317 Md. 380, 564 A.2d 399 (1989), Maryland is among a group of seven states taking the most restrictive position on when a party may by motion reopen a final judgment, even for the most compelling and equitable of reasons.

The Court of Appeals described the latitude in challenging and revising final judgments permitted by Federal Rule of Civil Procedure 60(b) and by the thirty-five states that follow its lead.

> The congressional contemplation concerning the reopening of decrees comports with Rule 60(b) of the Federal Rules of Civil Procedure. Specifically, Rule 60(b) contains two subsections which allow a court great latitude to permit post-final judgment relief. First, in subsection (b)(5) a court may relieve a party from a final judgment if "it is no longer equitable that the judgment should have prospective application." This provision allows a court to employ its equity power to determine that a judgment should be vacated. Second, the rule provides in subsection (b)(6) that a court may relieve a party from a final judgment for "any other reason justifying relief from the operation of the judgment." *Obviously this broad language vests a court with wide discretion. Some thirty five (35) states have adopted language substantially the same as in FRCP 60(b)(5) and/or 60(b)(6).*

317 Md. at 385–86, 564 A.2d 399 (emphasis supplied).

Judge Cole then pointed out that a second group of "[e]ight states has reserved equity or other broad powers to revise a final judgment." 317 Md. at 386–87, 564 A.2d 399. He further described the flexible approach permitted by those states.

> Inherent equity powers have been reserved by these states using language substantially different from FRCP 60(b)

Although some of these states enumerate possible grounds for vacating judgments, discretion is reserved, either expressly or by court interpretation, to achieve this objective. New York and Virginia deserve special notice, as they reserve their court's inherent equity powers to vacate or modify any judgments in the interest of substantial justice.

317 Md. at 387 n. 4, 564 A.2d 399.

Maryland, with six other states, falls into the final category, which is far more restrictive as to when a motion is allowed to revise or vacate a final judgment.

*The remaining group of states, into which we believe Maryland properly fits, limits the right of the court to revise or vacate the judgment to the specific grounds set forth in the applicable statute or rule.*

317 Md. at 387, 564 A.2d 399 (emphasis supplied). The Court of Appeals further elaborated:

All of these states enumerate specific grounds necessary to vacate or modify judgments and limit the timing during which these grounds may be raised. No reservations of equity powers to vacate judgments are provided.

*Id.* n. 5.

The *Andresen* opinion explained why Maryland has opted for a more restrictive approach.

Subsection (b) and (d) of Maryland Rule 2–535 authorize a judgment to be revised only in case of fraud, mistake, irregularity or clerical errors. Moreover, *our cases have rigorously emphasized the finality of judgments. See generally Penn Cent. Co. v. Buffalo Spring & Equipment Co.,* 260 Md. 576, 273 A.2d 97 (1971) (emphasizing *the desirability that there be an end to litigation).*

317 Md. at 387–88, 564 A.2d 399 (emphasis supplied).

In *Andresen,* the equity of a wife's request for a share of a military pension pursuant to the express provisions of the Uniformed Services Former Spouses' Protection Act (USFSPA) was compelling. Nevertheless, the Court of Appeals held the line.

There seems to be little doubt that Congress intended the USFSPA to be retroactive. *If this case had arisen earlier,* if the divorce decree had still been interlocutory, and if all of the requirements of the USFSPA had been met, *we would of course give effect to that congressional intent* and direct that the circuit court consider the military pension in making its marital property determinations and in arriving at a monetary award. *We do not believe, however, that the congressional intent went so far as to override state law concerning the reopening of final judgments.* As previously discussed, *the legislative history of the USFSPA discloses a congressional contemplation that final judgments could be reopened. In our view, this merely reflected Congress's awareness that the law in the vast majority of states, like the Federal Rules of Civil Procedure, would permit a reopening of final judgments* to accomplish the purposes of the USFSPA. On the other hand, *there is nothing in the legislative history demonstrating that Congress intended to preempt state procedural law setting forth the grounds for reopening a final judgment.*

Under Maryland law, Ruth Andresen has established no grounds upon which the trial court's final judgment may be reexamined. Consequently, we affirm the trial judge's dismissal of Ruth's motion to modify.

317 Md. at 390–91, 564 A.2d 399 (emphasis supplied).

The Court of Appeals recognized that many states would permit a decree to be reopened and modified.

We are aware that many state courts have reopened finalized divorce decrees to allow the former spouse to share in military pension benefits pursuant to the USFSPA. The cases, however, are in those jurisdictions having provisions like Federal Rule 60(b)(5) and (6) or in jurisdictions where the law provides broad powers to reopen final judgments.

317 Md. at 389, 564 A.2d 399.

The Court of Appeals contrasted the more liberal approach with that of Maryland (and, with approval, Texas and Missouri).

*In jurisdictions where the law concerning the reopening of final judgments is similar to Maryland law,* however, *courts have held that divorce decrees,* which became final during the *McCarty* era, *cannot be reopened.* In *Allison v. Allison,* 690 S.W.2d 340, 344 (Tex.App.1985) (no writ of error, 700 S.W.2d 914), the Texas Court of Appeals stated:

> The law of the courts of *this* state does not have an equivalent of Federal Rule 60 and does not recognize the authority of a trial court to relitigate issues as a general principle.

In *In re Marriage of Quintard,* 691 S.W.2d 950, 953 (Mo. App.1985), the Missouri intermediate court expressed a similar view.

> On the other hand, unlike Delaware and New Jersey, the Missouri Rules of Civil Procedure do not contain a comparable provision. Indeed, rather than providing a procedural mechanism by which a marital dissolution decree might be reexamined, *Missouri law rigorously stresses the finality thereof.*

317 Md. at 390, 564 A.2d 399 (emphasis supplied).

Indeed, the diametrically different positions on motions challenging final judgments taken by the federal government, as reflected by FRCP 60(b), and by Maryland, as reflected by *Andresen v. Andresen,* underscores why Maryland does not follow federal law with respect to the Writ of Audita Querela or even with respect to a motion in the nature of Audita Querela.

In the present case, as in *Andresen,* we know of no statute or rule that would permit the appellant to move for the relief he here seeks. Maryland would not, therefore, entertain even a motion in the nature of Audita Querela.

Our holding is unequivocal. The Writ of Audita Querela is dead. It has been dead for a long time. Forget it!

### An Affirmance Without Prejudice

We affirm the denial by Judge Matricciani of the appellant's petition for a Writ of Audita Querela. Our decision, however,

is without prejudice to the appellant's entitlement to apply for a Writ of Coram Nobis, should he deem it appropriate to do so. See *Skok v. State*, 361 Md. 52, 760 A.2d 647 (2000). We offer no opinion on whether such a petition would have merit, except to note that the appellant might be hard pressed to satisfy the third of the five qualifications spelled out by *United States v. Morgan*, 346 U.S. 502, 512, 74 S.Ct. 247, 98 L.Ed. 248 (1954) and *Skok v. State*, 361 Md. at 79, 760 A.2d 647 ("the coram nobis petitioner must be suffering or facing significant collateral consequences from the conviction.") It might be problematic whether the denial of an affirmative benefit generally, as opposed to the actual imposition of a negative sanction, would ever be deemed sufficiently "significant" to justify the issuance of the "extraordinary writ." It might also be problematic whether the denial of tuition credits specifically would be deemed a collateral sanction sufficiently "significant," like deportation, to justify the issuance of the "extraordinary writ." Those questions, however, are not before us.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**