RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2004 FED App. 0009P (6th Cir.)
File Name: 04a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

IJEOMA EJELONU,

      *Petitioner,*

   *v.*

IMMIGRATION AND
NATURALIZATION SERVICE,
DEPARTMENT OF HOMELAND
SECURITY,

      *Respondent.*

No. 01-3928

On Appeal from the Board of Immigration Appeals.
No. A76 971 785.

Submitted: January 31, 2003

Decided and Filed: January 8, 2004

Before: BATCHELDER, MOORE, and CLAY, Circuit Judges.

———————

## COUNSEL

**ON BRIEF:** Clement O. Ohuegbe, DENNING LAW FIRM PLCC, Dearborn, Michigan, for Petitioner. Ernesto H. Molina, Jr., David V. Bernal, UNITED STATES

---

DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

CLAY, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER, J. (pp. 24-33), delivered a separate dissenting opinion.

———————

## OPINION

———————

CLAY, Circuit Judge. Petitioner is a gainfully employed legal immigrant in her early twenties who currently studies psychology at Wayne State University in Detroit, Michigan. By all accounts, Petitioner should be a citizen; but for the Immigration and Naturalization Service's ("INS's") extended delay in processing Petitioner's citizenship application, the agency would have processed her application before Petitioner's eighteenth birthday and she would now in all likelihood be an American citizen. Petitioner was never convicted of any crime, her parents are citizens, her siblings are citizens, and her entire extended family resides in the United States. The Department of Homeland Security ("DHS") seeks to deport her to Nigeria.

For the reasons that follow, we **GRANT** the petition and **REMAND** for further proceedings consistent with this decision.

## FACTS

Born on May 24, 1979, in Otukpo, Nigeria, Petitioner legally immigrated to the United States at age six as a dependent under her parents' student visa. Petitioner's parents, Chrissie and Nath Ejelonu, became naturalized American citizens on September 11, 1996. In October of 1996, Chrissie filed Applications for Certificates of Citizenship on behalf of Petitioner and her two younger

sisters, Ogechi and Eze. Although DHS concedes Chrissie submitted complete applications, DHS (technically its predecessor, the INS), did not schedule an interview with Petitioner and her siblings until approximately ten months later, on August 18, 1997.

The INS subsequently made Ogechi and Eze citizens, but withheld citizenship from Petitioner because she turned eighteen after her mother filed her application but before the INS interview. At the time, the INS had the right under section 322(a) of the Immigration and Naturalization Act ("INA") to require that a child seeking citizenship "*is* under the age of 18 and in the legal custody of the citizen parent." *See* 8 U.S.C. § 1433(a) (2000) (emphasis added); *see also* 8 C.F.R. 322.2(a)(3) (2000) (reiterating the same rule). Since Petitioner was no longer under age eighteen when the INS *decided* her application (as opposed to when her mother filed it on her behalf), the INS refused Petitioner's request for citizenship and warned her that it would begin deportation proceedings.

Responding to this type of inequity, Congress enacted the Child Citizenship Act of 2000 ("CCA"), which automatically granted citizenship to most foreign-born children of American parents.[1] *See* Pub. L. No. 106-395, 114 Stat. 1631, *codified*

---

[1] As Congressman Bill Delahunt explained during the debate over the CCA:

[T]his bill would avoid some heartbreaking injustices that have sometimes tragically occurred. Some parents have discovered to their horror that their failure to complete the paperwork in time can result in their forced separation from their children under the summary deportation provisions Congress enacted back in 1996.

That was the experience of the Gaul family of Florida who adopted their son John at the age of 4. Though he was born in Thailand, he speaks no Thai, has no Thai relatives, knows nothing of Thai culture and has never been back to Thailand, until the U.S. Government deported him last year as a criminal

*at* 8 U.S.C. § 1431 (2001). Without the benefit of this legislation, Chrissie filed a Petition for Relative Alien and an Adjustment of Status petition to avoid Petitioner's deportation. Chrissie did not withdraw Petitioner's request for citizenship, which remains pending before DHS.

Meanwhile, Petitioner graduated with honors from Northern High School in Pontiac, Michigan. Afterward, she began college at Wayne State University. Petitioner was active in Central United Methodist Church in Waterford, Michigan. She also assumed a large role in helping her parents care for Ogechi and Eze.

While in school, Petitioner held jobs at Office Depot and Hudson's department store. Working at Hudson's in the summer of 1998, at age seventeen, she waited on a family that resided in her neighborhood. When it came time for the family to pay for its purchases, a family member asked Petitioner to accept a credit card number without the credit card. Although Petitioner knew this violated store policy, she acceded to the request. The family returned later in the week and Petitioner repeated the impropriety. Although Petitioner simply placed unwarranted trust in a neighborhood family, she never received any money or share of the stolen goods for permitting these transactions.

---

alien at the age of 25 for property offenses that he had committed when he was a teenager.

One may ask how this could happen. The Gauls had obtained an American birth certificate for John shortly after adopting him and did not realize until he applied for a passport at age 17 that he had never been naturalized. They immediately filed the papers; but due to INS delays, his application was not processed before he turned 18. An immigration judge ruled that the agency had taken too long to process the application, but that did not make any difference. The 1996 law allowed him no discretion to halt the deportation. At least that is how the INS interpreted it.

146 CONG. REC. H7774, H7777 (Sept. 19, 2000).

Hudson's captured the incidents on its security cameras. On December 3, 1998, police arrested Petitioner and charged her with two counts of Embezzlement by an Agent or Trustee of Over $100, in violation of M.C.L. § 750.174. Michigan has established a rehabilitation-oriented legal framework to handle precisely this type of juvenile misconduct. Known as the Holmes Youthful Trainee Act ("HYTA"), M.C.L. §§ 762.11-14, the HYTA provides that "[i]f an individual pleads guilty to a charge of a criminal offense . . . committed on or after the individual's seventeenth birthday but before his twenty-first birthday," the court has the authority to "assign that individual to the status of youthful trainee," and to do so "*without entering a judgment of conviction.*" M.C.L. § 762.11 (emphasis added); *see also United States v. LeBlanc*, 612 F.2d 1012, 1013 (6th Cir. 1980) ("The appellant's assignment to 'youthful trainee' status was made pursuant to the Holmes Youthful Trainee Act. Such an assignment does not constitute conviction of a crime within the meaning of Rule 609, Federal Rules of Evidence.") (citation omitted).

Youthful trainees generally receive probation, make restitution, perform community service, or commit to other measures designed to rehabilitate the Youthful Trainee. *See* M.C.L. § 762.13. As one court explained, "[t]he Holmes Youthful Trainee Act constitutes remedial legislation designed to alleviate problems with young offenders by permitting the use of rehabilitation procedures *prior to conviction.*" *People v. Perkins*, 309 N.W.2d 634, 636 (Mich. Ct. App. 1981) (emphasis added). "Once compliance is achieved, a youthful trainee *will not be deemed convicted of a crime* and proceedings regarding the disposition of the criminal charge will be closed to public inspection." *People v. Bobek*, 553 N.W.2d 18, 21 (Mich. Ct. App. 1996) (emphasis added). Thus, the Michigan legislature intended the HYTA to allow youthful offenders a chance at rehabilitation without having to face the lifelong consequences of a criminal conviction.

Petitioner took advantage of this opportunity. On January 4, 1999, the court placed her on probation and required her to make restitution. Pursuant to M.C.L. § 726.13, the court sealed the record of all proceedings involving Petitioner. She immediately began searching for a new job, and found one at the Crittenton Hospital in Rochester, Michigan. She would never begin work.

Someone, perhaps in the local police department, turned over the judicially-sealed Youthful Trainee record to the INS. On January 16, 2003, INS agents raided Petitioner's home, seized her by force, and initiated deportation proceedings.

### PROCEDURAL HISTORY

For weeks, the INS held Petitioner in custody. She had no opportunity to contact her family. On February 20, 2000, the INS formally commenced removal proceedings against Petitioner by filing a Notice to Appear with the Executive Office of Immigration Review. The Notice to Appear alleged that the INS could deport Petitioner for being convicted of two separate crimes involving moral turpitude, in violation of 8 U.S.C. § 1227(a)(2)(A)(ii). INA § 237(a)(2)(A)(ii) provides:

> Any alien who at any time after admission is convicted of two or more crimes of moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefore and regardless of whether the convictions were in a single trial, is deportable.

8 U.S.C. § 1227(a)(2)(A)(ii). The INA also defines conviction:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

(I) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A). Since Petitioner admitted her mistake and received probation and restitution obligations (restraints on her liberty), an immigration judge found Petitioner deportable on August 15, 2000.

Petitioner filed a Notice of Appeal to the Board of Immigration Appeals ("BIA") on September 7, 2000. On August 3, 2001, the BIA dismissed her appeal. Petitioner implores us to review that decision.

## DISCUSSION

Our review of the BIA is somewhat limited because we must defer to its reasonable interpretation of the immigration statutes it administers. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). Petitioner's lackluster briefing also makes our review challenging. We recognize that Petitioner lacks the resources of the INS or, for that matter, the resources of an average American. As an immigrant, college student, and low-wage worker, Petitioner's financial and legal resources are probably quite limited.

Petitioner's counsel initially requests that we use our equitable authority to grant Petitioner's citizenship, although two Supreme Court decisions prohibit us from taking that step. *See INS v. Pangilinan*, 486 U.S. 875, 883-84 (1988); *Fedorenko v. United States*, 499 U.S. 490, 517 (1981). Petitioner would also like us to review the BIA's decision *de novo*, but *Chevron, USA v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984), prevents this, as do

subsequent decisions like *Aguirre-Aguirre*, 526 U.S. at 424. Petitioner also raises a litany of other disorganized concerns, including a highly unclear equal protection claim and possibly a substantive due process issue as well.

We can still confidently draw two conclusions: (1) Petitioner wants us to halt her deportation; and (2) Petitioner suggests that we use our equitable power to do so. (*See* Pet'r Br. at 25-26.) We can therefore properly construe her pleading as a request for a writ of *audita querela*.

## I.

"The common-law writ of *audita querela* is a remedy granted in favor of one against whom execution has issued or is about to issue on a judgment the enforcement of which would be contrary to justice, either because of matters arising subsequent to its rendition, or because of prior existing defenses that were not available to the judgment debtor in the original action because of the judgment creditor's fraudulent conduct or through circumstances over which the judgment debtor had no control." 7 Am. Jur. 2d, *Audita Querela* § 1, at 432 (1997). We note that writs of *audita querela* and *coram nobis* are similar, but legally distinct. As one court explained:

It was said that 'We see but little distinction between the writ of *coram nobis* and that of *audita querela*.' The technical distinction is that *coram nobis* attacks the judgment itself, whereas *audita querela* may be directed against the enforcement, or further enforcement, of a judgment which when rendered was just and unimpeachable.

*Balsley v. Commonwealth*, 428 S.W.2d 614, 616 (Ky. 1967) (quoting *Robertson v. Commonwealth*, 132 S.W.2d 69, 71 (1939), *overruled on other grounds*, *Commonwealth v. Hale*, 965 S.W.3d 24 (Ky. 2003). Put differently, *coram nobis*

attacks the judgment itself, whereas *audita querela* attacks the consequences of the judgment.

Although the writ is rarely used, courts have issued writs of *audita querela* in immigration cases similar to this one. *See, e.g.*, *United States v. Khalaf*, 116 F. Supp. 2d 210, 217 (D. Mass. 1999); *United States v. Selgado*, 692 F. Supp. 1265, 1269 (E.D. Wash. 1988); *United States v. Ghebreziabher*, 701 F. Supp. 115, 117 (E.D. La. 1988); *United States v. Haro*, CR No. 85-00612 WJR (C.D. Cal. May 30, 1990) (unpublished order); *United States v. Louder*, Cr. No. 82-1084 (WWE) (D. Conn. May 1, 1999) (unpublished order); *see also* 105 ALR Fed 880, George C. Sarno, *Availability and Appropriateness of Audita Querela Relief in Connection With Immigration and Naturalization Proceedings* (1991).

## II.

From the outset, we note that the writ of *audita querela* survives in certain instances despite the 1946 amendments to the Federal Rules of Civil Procedure, which partly abolished several common law writs including *coram nobis* and *audita querela*.[2] Despite the 1946 amendments, the Supreme Court held in *United States v. Morgan*, 346 U.S. 502 (1954), that courts still have authority to issue writs of *coram nobis* in collateral criminal proceedings. *Id.* at 506-510. The *Morgan* Court initially noted that Rule 60(b) governs only civil proceedings.[3] *Id.* at 505 n.4. The Court also expressly rejected the argument that the federal habeas statute, 28 U.S.C. § 2255, had the effect of abolishing common law

---

[2] "Writs of *coram nobis*, *coram vabis*, *audita querela*, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action." FED. R. CIV. P. 60(b).

[3] Significantly, the Federal Rules of Civil Procedure do not govern deportation proceedings.

writs in criminal proceedings. *Id*. at 511. According to the D.C. Circuit, "[t]he teaching of *Morgan* is that federal courts may properly fill the interstices of the federal postconviction remedial framework through remedies available at common law." *United States v. Ayala*, 894 F.2d 425, 428 (D.C. Cir. 1990). For this reason, despite their seemingly anachronistic qualities, federal courts still have the authority to grant writs of *audita querela*, generally pursuant to the All Writs Act, 28 U.S.C. § 1651. *See Doe v. INS*, 120 F.3d 200, 203 (9th Cir. 1997); *United States v. Johnson*, 962 F.2d 579, 583 (7th Cir. 1992); *United States v. Reyes*, 945 F.2d 862, 866 (5th Cir. 1991); *United States v. Holder*, 936 F.2d 1, 3 (1991); *Ayala*, 894 F.2d at 428.

## III.

As an infrequently used remedy, modern courts have struggled to define the scope of the writ. In fact, the Advisory Committee notes to Fed. R. Civ. P. 60(b) describe common law writs like *audita querela* as "shrouded in ancient lore and mystery." The Tenth Circuit explained,

> According to its ancient precepts, the writ of *audita querela* was invented to afford relief in behalf of one against whom execution had been issued or was about to be issued upon a judgment, which it would be contrary to justice to allow to be enforced, because of matters arising subsequent to the rendition thereof.

*Oliver v. City of Shattuck ex rel. Versluis*, 157 F.2d 150, 153 (10th Cir. 1946) (collecting cases). Other sister circuits to have considered the issue have held that a writ of *audita querela* cannot provide purely equitable relief, but can issue only when the petitioner demonstrates a legal defect in the underlying proceedings. *See, e.g.*, *Doe v. INS*, 120 F.3d at 203-04; *United States v. LaPlante*, 57 F.3d 252, 253 (2d Cir. 1995); *Johnson*, 962 F.2d at 582; *Holder*, 936 F.2d at 5; *Reyes*, 945 F.2d at 866.

None of these cases provide much independent analysis; rather, these opinions invariably base their conclusions on the D.C. Circuit's decision in *United States v. Ayala*, 894 F.2d 425. *See, e.g.*, *Holder*, 936 F.2d at 3 ("We agree with the D.C. Circuit Court of Appeals that the writ of *audita querela* does not and cannot, under any stretch of the imagination, provide a purely equitable basis for relief independent of any legal defect in the underlying judgment."). As the Ninth Circuit explained in the most recent opinion analyzing the issue, "the District of Columbia Circuit was first to explain why [courts granting *audita querela* relief based on purely equitable grounds] were mistaken, as a historical matter, in their conclusion that *audita querela* furnishes a purely 'equitable' basis for relief independent of any legal defect in the underlying judgment." *Ayala*'s rationale warrants further consideration.

*Ayala* never mentions the definition of *audita querela* provided in *Oliver*, 157 F.2d at 153. *See Ayala*, 894 F.2d at 425. The D.C. Circuit cites *Humphreys v. Leggett*, 50 U.S. (9 How.) 297, 314 (1850), for its sweeping conclusion that "because the so-called 'pure equity' variant of *audita querela* finds no support in the historical definition of the writ, the authority of the federal courts to use it as a[n] [equitable] 'gap filler' under the All Writs Act is open to serious doubt." *Ayala*, 894 F.2d at 429 n.6. *Humphreys* is not particularly helpful to *Ayala*'s conclusion. According to *Humphreys*, a writ of *audita querela* is:

'a writ,' it is said, 'of a most remedial nature, and invented lest in any case there should be an oppressive defect of justice, where a party who has a good defence is too late in making it in the ordinary forms of law'; and *although it is said to be in its nature a bill in equity*, yet, in modern practice, courts of law usually afford the same remedy on motion in a summary way. The practice in Mississippi seems to prefer a bill in equity for the same purpose.

And courts of equity usually grant a remedy by injunction against a judgment at law, upon the same principles. In *Truly v. Wanzer*, 5 Howard, 142, this court say,--'*It may be stated as a general principle with regard to injunctions after a judgment at law, that any fact which proves it to be against conscience to execute such judgment, and of which the party could not have availed himself in a court of law*, or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will authorize a court of equity to interfere by injunction to restrain the adverse party from availing himself of such judgment.' (See also Story, Eq. Jur. § 887.)

*Humphreys*, 50 U.S. (9 How.) at 313 (emphasis added). Thus, according to the Supreme Court, "[i]t may be stated as a general principle with regard to injunctions after a judgment at law [writs of *audita querela*], that any fact which proves it to be against conscience to execute such judgment, and of which the party could not have availed himself in a court of law." *Id*. (quotation omitted).

Although the *Humphreys* Court granted relief because the petitioner was "in the same condition as if the defense had arisen after judgment, which would entitle him to relief by *audita querela*," the *Humphreys* Court never held that a new legal defense against an old judgment provided the *only* basis for *audita querela* relief. In fact, the Court made clear that a petitioner may receive a writ of *audita querela* when the petitioner can show that some fact that "proves it to be against conscience to execute such [a] judgment," and which the party could not have previously raised. *Humphreys*, 50 U.S. (9 How.) at 313.

Apparently, the only modern academic to conduct thorough historical research into *audita querela*'s common law origins, Professor Robins, found *Ayala* "flawed" because "[r]equiring that there be a legal objection to the conviction deviates from

the common-law use of the writ." *See* Ira P. Robins, *The Revitalization of the Common-Law Civil Writ of Audita Querela as a Postconviction Remedy in Criminal Cases: The Immigration Context and Beyond*, 6 GEO. IMMIGR. L.J. 643, 681-82 (Dec. 1992).

We similarly reject the dramatically narrow historical analysis upon which *Ayala* and its progeny depend. Early scholarly commentary on *audita querela* strongly indicates the writ's equitable nature. Historian William Holdsworth argued that *audita querela* is of "essentially equitable character." 1 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 224 (3d ed. 1922). Holdsworth cited Judge Stonor of King Edward III's reign, who stated, "I tell you plainly that *Audita Querela* is given rather by equity than by common law, for quite recently there was no such suit." *See* 2 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 593 (1922). Significantly, Holdsworth also relied upon Blackstone's Commentaries, which described *audita querela* as "in the nature of a bill in equity, to be relieved against the oppression of the plaintiff." 1 HOLDSWORTH, *supra*, at 224 (citing 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 406 (William D. Lewis ed. 1900)). According to Holdsworth, the development of *audita querela* demonstrates that lawyers at the time 'were not indifferent to the claims of abstract justice." 2 HOLDSWORTH, *supra*, at 593. Thus, Holdsworth "argued that *audita querela* was a method used to provide relief when the equities suggested it should be granted." Robins, *supra*, at 650.

Early state cases support the Tenth Circuit's position, and what *Ayala* terms the "pure equity" approach to *audita querela* better reflects the writ's common law origins. As a general matter, these early decisions rely on Blackstone, whom Holdsworth used to conclude that *audita querela* is of "essentially equitable character," 1 Holdsworth, *supra*, at

224.[4] *See, e.g., Boynton v. Boynton*, 172 S.W. 1175, 1177 (Mo. Ct. App. 1914) ("[T]he writ of *audita querela* lies 'in the nature of a bill in equity.'") (quoting BLACKSTONE, *supra*, at 406); *Bryant v. Johnson*, 24 Me. 304 (1844) (noting that a writ of *audita querela* "is in the nature of a bill in equity, to be relieved against the oppression of the plaintiff") (quoting BLACKSTONE, *supra*, at 406); *Lovejoy v. Webber*, 10 Mass. 101, 103 (1813) ("The remedy is said to be in the nature of a bill of equity.") (quoting BLACKSTONE, *supra*, at 406). In language similar to the Tenth Circuit's definition, the Massachusetts Supreme Court wrote that *audita querela* is a proceeding "where the defendant in the original suit will be unjustly deprived of his rights, if the judgment or execution . . . is allowed to be treated as valid." *Coffin v. Ewer*, 46 Mass. 228, 230-31 (1842). Likewise, the Missouri Court of Appeals explained that *audita querela* "is founded upon some matter of equity, or fraud, or release, or something of like nature, which transpired since the rendition of the judgment, and which would render its enforcement inequitable and unjust." *State v. Hall*, 17 S.W.2d 935, 937 (Mo. Ct. App. 1928). Most recently, a federal district court in California defined *audita querela* as a writ "used to vacate a judgment

---

[4] *Ayala* also cites Blackstone for the proposition that one requesting a writ of *audita querela* must "show a postjudgment contingency supplying a 'matter of discharge' or 'defense.'" *Ayala*, 894 F.2d at 429 (quoting BLACKSTONE, *supra*, at 405-06). The law-equity distinction has produced some confusion, partly because some courts have found it inequitable to let the consequences of a legally erroneous judgment remain in force, and partly because some courts have mistakenly read those decisions as *requiring* a legal error in the underlying judgment. The view *Ayala* articulates would make *audita querela* superfluous because we already have a *remedy at law*—habeas—against a legally erroneous criminal judgment. As noted, the Supreme Court has rejected the argument that the federal habeas statute, 28 U.S.C. § 2255, abolished common law writs in criminal proceedings. *Morgan*, 346 U.S. at 511. *Audita querela* is distinct from habeas or other similar collateral proceedings that require the petitioner to demonstrate legal error, which is why Holdsworth concluded that the development of *audita querela* demonstrates that ancient lawyers "were not indifferent to the claims of abstract justice." 2 HOLDSWORTH, *supra*, at 593.

upon a showing that events occurring after the entry of judgment cause the continued existence of the judgment to be contrary to the interests of justice." *Haro*, CR No. 85-00612 WJR, at 3.

As the aforementioned authority establishes, the *Ayala* court was incorrect when it concluded that the "'pure equity' variant of *audita querela* finds no support in the historical definition of the writ." 894 F.2d at 429. *Ayala* relies on *Humphreys*, but *Humphreys* supports the idea that courts may issue the writ when it "proves to be against conscience to execute [a] judgment." *Humphreys*, 50 U.S. (9 How.) at 313. Nothing in *Humphreys* requires courts to find a legal error in the original judgment. Worse, *Ayala* contends that the "'pure equity' variant of *audita querela* finds no support in the historical definition of the writ," 894 F.2d at 429, without acknowledging the Tenth Circuit's opinion in *Oliver*, which collected a series of relevant cases and held that "*[a]ccording to its ancient precepts, the writ of audita querela was invented to afford relief in behalf of one against whom execution had been issued . . . which it would be contrary to justice to allow to be enforced, because of matters arising subsequent to the rendition thereof.*" *Oliver*, 157 F.2d at 153 (emphasis added).[5] We adopt the conclusions of the Tenth Circuit, Blackstone, the eminent historian Holdsworth, and Professor Robins, and therefore find that we may mitigate a judgment's collateral consequences through a writ of *audita*

---

[5]The dissent quotes *Oliver* as saying the writ of *audita querela* grants relief to "one against whom execution had been issued or was about to be issued upon a judgment, which it would be contrary to justice to allow to be enforced, *because of matters arising subsequent to the rendition thereof.*" The instant case satisfies the requirements of *Oliver* because "execution" was issued against Petitioner when the court permitted her to be diverted from the criminal justice system as a trainee under the Holmes Youthful Trainee Act ("HYTA"), M.C.L. §§ 762.11-14 in lieu of convicting her of a crime, and placed her on probation and ordered her to pay restitution; and the removal proceeding against Petitioner under 8 U.S.C. § 1227(a)(2)(A)(ii) constituted a matter which arose *subsequent* to the disposition under the HYTA.

*querela* issued for equitable reasons, regardless of the presence of a legal defect in the original proceeding.

## IV.

Consistent with this conclusion, several courts have granted writs of *audita querela* to mitigate the collateral consequences of an earlier criminal conviction when failing to do so would have produced an unconscionable result. In *Selgado*, for instance, the petitioner received a writ of *audita querela* to stop his deportation based on a twenty-four-year-old guilty plea to a marijuana offense. *Id*. at 1266. Selgado originally immigrated in 1939. Following his conviction, Selgado voluntarily left the country for five years, reentered in 1969, and lived as a productive member of society for the decades following his conviction. *Id*. When he applied for Social Security benefits in 1984, the INS discovered it should have deported him. *Id*.

Selgado argued that he received ineffective assistance of counsel in the original 1964 proceeding because his lawyer did not inform him of the immigration consequences of his guilty plea.[6] *Id*. at 1267. The court, however, rejected this contention along with several other legal arguments, and found no legal error had occurred. Instead, the court noted that:

> considering that no single [legal] factor of those arrayed above would warrant granting the [writ of *audita querela*], the Court is left with the unmistakable impression that under the totality of the circumstances, it would be a gross injustice to allow this man, who has by all accounts been a model resident for forty-five years save for a single period of unlawful conduct, to effectively serve a life sentence, and for his family to be

---

[6]In the instant case, Petitioner's counsel did not inform her of the immigration consequences of her acquiescence to Youthful Trainee status.

deprived of benefits from a fund he has paid into throughout his life.

*Id*. at 1268.  The court also recognized a potential objection:

There may be those with a more callous view of life who might conclude that Mr. Selgado has nothing to complain about.  It is undisputed that he committed the crime charged, and he paid the reasonably foreseeable penalty of deportation.  Some might say that his continuing enjoyment of life in the United States between 1969 and the present was a serendipitous happenstance which accrued to his benefit and which created no cognizable expectation of entitlement to remain indefinitely.  The Court cannot subscribe to such a hardened approach.

*Id*. at 1271.  For these purely equitable reasons, the *Selgado* court issued a writ of *audita querela* on the petitioner's behalf.  *Id*.

In *United States v. Ghebreziabher*, 701 F. Supp. 115 (E.D. La. 1988) a court granted *audita querela* relief for similar reasons.  *Ghebreziabher* involved an Ethiopian native who entered the United States in 1979.  *Id*. at 116.  Ghebreziabher initially worked in a shipyard before starting his own successful business and purchasing a home.  *Id*.  He also married and had four children.  *Id*.  In 1987, however, he pleaded guilty to three misdemeanor counts of food stamp trafficking.  *Id*.  Ghebreziabher had accepted food stamps in exchange for $220 worth of merchandise without authorization.  *Id*.  Ghebreziabher received probation and had to repay the $220.

Despite the government's arguments in support of Ghebreziabher's deportation, the court relied on various equitable considerations to reach a different outcome:

Mr. Ghrebreziabher has been an industrious member of this community for almost ten years. He has four United

States citizen children who will be deprived of his support if he should be deported. He has realized the American dream, owning his own home, and has reduced the mortgage on it from $58,500.00 to $33,000.00 in approximately 6 years. Except for these 3 incidents, he has no convictions. His former employer, a subsidiary of a shipyard where he worked as a carpenter and joiner, thought well of him and found him to be hard-working. The political climate of Ethiopia is another consideration. The State Department has designated Ethiopia as a country of voluntary departure since 1982 due to its internal strife. Since the defendant had to escape from the country initially, the future for Mr. Ghebreziabher there appears to be foreboding. It is also likely that his family will suffer tremendously should he be deported and removed from the home.

*Id*. at 117. On this basis, the court found it "in the interests of justice" to issue a writ of *audita querela*. *Id*. *Selgado* and *Ghebreziabher* help further establish *audita querela*'s equitable character and its utility in immigration proceedings.[7]

---

[7] We also note the interesting decision in *United States v. Javanmard*, 767 F. Supp. 1109 (D. Kan. 1991). *Javanmard* involved a situation similar to this case (and *Selgado/Ghebreziabher*), in which the INS sought to deport someone based on a minor criminal conviction. *Id*. at 1110. The court refused to grant a writ of *audita querela* under the mistaken belief that it could do so only if a legal error occurred in the initial proceeding. *Id*. at 1110-11. Nevertheless, the court held that "it appears to be generally conceded, and the government at hearing also conceded, that the district courts have the power to afford the relief required here on equitable grounds under the All-Writs Act, 28 U.S.C. § 1651(a)." *Id*. at 1111. According to the court, "[g]iven all of the circumstances of this case, the court finds that the equitable considerations weigh in favor of Mr. Javanmard's interest in obtaining . . . relief, as opposed to the government's interest in maintaining a criminal record." *Id*. at 1112. Since "this court finds it has wide latitude under the All-Writs Act to construct any remedy necessary to 'achieve justice[,]' . . . . Mr. Javanmard's conviction may and should be vacated." *Id*. at 1111. Therefore, the *Javanmard* court declined to issue a writ of *audita querela*

### V.

We have no trouble concluding that the equities in this case overwhelmingly favor Petitioner—not just to the point where a reasonable person might sympathize with her plight, but to extent that to deport her under such circumstances would shock the conscience.

First, Petitioner would be a citizen if the INS had acted in a timely fashion, which would render her undeportable regardless of her Youthful Trainee status. Petitioner's mother filed the necessary paperwork on time, and Petitioner met the statutory criteria for citizenship. Had the INS not waited a year to interview Petitioner, Petitioner would have become a citizen and these deportation proceedings could not have occurred. The government's conduct is *sine qua non* of Petitioner's current predicament.

Second, by passing the CCA, Congress established that the United States would no longer deport individuals for minor youthful infractions when the individual should have received citizenship. *See* 8 U.S.C. § 1431. When considering the CCA, Representative Lamar Smith recognized the precise bureaucratic problem that deprived Petitioner of her citizenship. Smith explained, "[i]n cases involving children who are approaching their 18th birthday, the delay could result in some children losing the opportunity to acquire citizenship under provisions of the law." Statement of Representative Lamar Smith, Chairman of the House Subcommittee on Immigration and Claims, "Adopted Orphans Citizenship Act and Anti-Atrocity Alien Deportation Act," Hearing Before the Subcommittee on Immigration and

on the misguided theory that it could not do so without finding a legal error in the initial proceeding—*yet the court still found it had equitable power to halt the collateral consequences of the conviction*. In fact, the court not only prevented the collateral consequences of Javanmard's conviction, it agreed to *vacate* the conviction entirely pending Javandmard's satisfaction of an earlier restitution order. *Id*. at 1112.

Claims of the Committee on the Judiciary, 106th CONG., 1ST SESS. (Feb. 17, 2000), at 2.

For whatever reason, the INS vehemently opposed the CCA. *See* Statement of Gerri Ratliff, Director, Business Process & Re-Engineering Services and Acting Director, Office of Congressional Relations, Immigration and Naturalization Service, "Adopted Orphans Citizenship Act and Anti-Atrocity Alien Deportation Act," Hearing Before the Subcommittee on Immigration and Claims of the Committee on the Judiciary, 106th CONG., 1ST SESS. (Feb. 17, 2000), at 11 (arguing against the proposed legislation).

Congress ignored the INS. As Congressman Sam Gejdenson explained during the debate over the CCA, "[t]here are tragic cases where children of U.S. parents, never naturalized because of inadvertence, are facing deportation because of a crime they have committed. While these children must face their punishment, to deport them to countries with which they have no contact . . . is needlessly cruel." 146 CONG. REC. H7774, H7778 (Sept. 19, 2000). Representative Bill Delahunt agreed: "No one condones criminal acts . . . but the terrible price these young people and their families have paid is out of proportion to their misdeeds." 146 CONG. REC. H7774, H7777 (Sept. 19, 2000).

To whatever extent DHS feels it has an obligation to carry out Congressional policy embodied in old immigration law, Congress has changed the rules so that juvenile offenders in Petitioner's position no longer face draconian consequences because the INS unreasonably delayed processing a citizenship request. DHS now (in 2003) seeks to perpetuate a problem Congress acted to eliminate in 2000.

Third, this entire proceeding is founded upon illegally-obtained evidence. As noted, the court sealed the proceedings that occurred pursuant to the Holmes Youthful Trainee Act. *See* M.C.L. § 726.13. In violation of the court's order, someone revealed the records to the INS. Very few parties

had lawful access to those records; most likely, only the police department, Petitioner's counsel, Michigan's representative, the court, and the State probation authority could have delivered the documents to the INS. Someone in a position of trust betrayed Petitioner and his responsibility both to the court and the State of Michigan, which requires courts to seal Youthful Trainee records. *See* M.C.L. § 726.13. Although deportation proceedings have no "exclusionary rule," we should never encourage anyone to break state law or violate judicial orders. Nor should we encourage DHS to ignore how it acquires evidence. Someone broke Michigan law and violated a court order in a disturbingly inexcusable attempt to force Petitioner out of the country. To deport her would reward the wrongdoer.

Fourth, although Petitioner did not receive legally ineffective assistance of counsel, her counsel never informed her that accepting Youthful Trainee status would have serious immigration consequences. Counsel should always make clients aware of any possible serious collateral consequences to a judgment. Had Petitioner known that acquiescing to Youthful Trainee status would make her deportable, it seems likely she would have pleaded not guilty and fought the charges. Michigan law does not have a mandatory minimum penalty for violating M.C.L. § 750.174; if found guilty, Petitioner could have received anything from probation to a five-year sentence. *See* M.C.L. § 750.174(4). Since DHS equates Youthful Trainee status with a conviction, Petitioner had nothing to lose by proceeding to trial. Inadequately informed by her counsel, however, Petitioner accepted Youthful Trainee status rather than try her case, and thus traded the possibility of deportation for the certainty of deportation.

Finally, equity demands a writ of *audita querela* to avoid a punishment grossly disproportionate to the offense. DHS proposes that, as a consequence of two minor juvenile thefts, Petitioner should serve what amounts to a life sentence in an underdeveloped, impoverished country. Petitioner has no

relatives remaining in Nigeria. There is no evidence in the record that Petitioner can speak any of the hundreds of dialects or languages spoken in Nigeria. Apparently, DHS would simply put Petitioner on a plane to Abuja and congratulate itself. DHS would condemn Petitioner to a life of penury, or worse.

*Audita querela* is appropriate because it would be "contrary to justice," *Oliver*, 157 F.2d at 153, to allow the collateral consequences of Petitioner's Youthful Trainee status to justify her deportation.

## VI.

Before concluding, we wish to stress a few points about our decision or, more precisely, to emphasize what we have *not* done. We have not granted Petitioner's request for citizenship. She is not currently a citizen, and this decision does not make her one or otherwise affect her status in that regard.

Additionally, we note that our narrow mandate raises neither separation-of-powers problems nor federalism concerns. One of the circuit decisions following *Ayala* claimed that "[f]or a court to vacate a final conviction solely because the defendant faces deportation" would violate the separation of powers. *Doe v. INS*, 120 F.3d at 204. This view is seriously mistaken because, as discussed above, *audita querela* does not vacate judgments, but the collateral consequences of judgments. If Congress dislikes what we have done, it can prohibit courts from issuing writs of *audita querela* with respect to the collateral consequences of criminal convictions just as Congress terminated the judiciary's ability to issue such writs in ordinary civil proceedings by implementing Fed. R. Civ. P. 60(b).

Likewise, any federalism concern one might raise about this decision is unwarranted. When someone seeks to attack the validity of his state conviction or the duration of his state

sentence, habeas corpus is his exclusive remedy. *Wolff v. McDonnell*, 418 U.S. 539, 554 (1974); *Preiser v. Rodriguez*, 411 U.S. 475, 489-91 (1973). Our mandate does not vacate or even suggest the invalidity of Michigan's "judgment" that Petitioner qualifies as a Youthful Trainee, nor do we purport to lift any of the concomitant sanctions Michigan imposed. This decision merely enjoins the federal DHS from using Petitioner's Youthful Trainee status to demonstrate Petitioner's statutory eligibility for deportation as long as Petitioner completes her obligations under the Holmes Youthful Trainee Act.

Finally, we have not created some new easy means to object to deportation. *Audita querela* is an equitable remedy reserved only for the most extreme cases. Although our decision is not necessarily limited to the facts of this case, this holding will not support relief if deportation is either not unconscionable or where DHS can articulate *any* legitimate reason for its decision to deport.

## CONCLUSION

For the aforementioned reasons, we **GRANT** Petitioner's request for a writ of *audita querela*. The writ prohibits DHS from using Petitioner's Youthful Trainee status to demonstrate Petitioner's statutory eligibility for deportation as long as Petitioner completes her obligations under the Holmes Youthful Trainee Act. We **REMAND** for further proceedings consistent with this opinion.

_____

## DISSENT
_____

ALICE M. BATCHELDER, Circuit Judge, dissenting. I respectfully dissent. Although, like the majority, I am sympathetic to Ijeoma Ejelonu's plight, I cannot join with the Court's use of an extraordinary writ that was never sought by Ejelonu nor briefed by any of the parties in this case. It is not proper for this Court to construe Ejelonu's pleading as a request for a writ of *audita querela*, and had she in fact requested such relief, it would not be proper for this Court to grant it.

### I.

The facts of this case are indeed troubling. As the majority points out, had the INS acted in a timely fashion, Ejelonu would be a citizen and would not be deportable regardless of her having committed these offenses. And deporting Ejelonu because she committed these offenses seems unduly harsh—she has no known relatives remaining in Nigeria, and has not lived there herself since she was a child. Unlike the majority, however, I do not assume that the information upon which the deportation proceedings are based necessarily was obtained in violation of a court order or by any nefarious means. M.C.L. § 762.14(4) provides that the records in a proceeding under the Holmes Youthful Trainee Act ("HYTA"), M.C.L. §§ 762.11-.15, "shall be closed to public inspection, but shall be open to the courts of this state, the department of corrections, the department of social services, and law enforcement personnel for use only in the performance of their duties." The Michigan court specifically ordered that, pursuant to M.C.L. § 769.16a, the court clerk was to send to the Michigan State Police Central Records Division, for purposes of creating a criminal history record, a copy of the order assigning Ejelonu to Youthful Trainee Status. Ejelonu admits that her application for citizenship

remained pending before the INS, and 8 U.S.C. § 1446 requires that before a person may be naturalized, the Service or the Attorney General "shall conduct a personal investigation of the person." Hence, it is certainly not unlikely that the INS acquired the information entirely within the bounds of the court's order and the Michigan law. And unlike the majority, I believe that we must act in accordance not with our personal weighing of the equities, but with the law.

Ejelonu is before this Court on appeal from an order of the Board of Immigration Appeals ("BIA") dismissing her appeal of an Immigration Judge's ("IJ") order of removal. The INS began removal proceedings in February 2000 after Ejelonu pleaded guilty to two counts of embezzlement. After Ejelonu moved to terminate the removal proceedings, the IJ concluded that Ejelonu was not a citizen of the United States and that she had been convicted of two separate crimes of moral turpitude. Ejelonu appealed this decision to the BIA, which dismissed the appeal and found Ejelonu removable under the Immigration and Naturalization Act.

Ejelonu has raised only two issues before this Court. First, she contends that the BIA erred in holding that her guilty plea entered under the M.C.L. § 762.11 constitutes a "conviction" for immigration purposes. Second, she argues that the BIA erred in upholding the IJ's determination that she was not a citizen because she failed to obtain a certificate of citizenship before her eighteenth birthday. Ejelonu does not succeed in proving either of these claims.

Ejelonu did not meet the statutory requirement for citizenship because she was not under the age of eighteen when the INS adjudicated her mother's application on her behalf. *See* 8 U.S.C. § 1433(a). It is unfortunately irrelevant that the INS caused this problem by delaying for more than seven months the processing of Ejelonu's citizenship application. The Supreme Court clearly held in *INS v. Pangilinan*, 486 U.S. 875, 883-84 (1988), that equitable powers cannot be invoked to confer citizenship in the absence of a statutory requirement. "A court [] cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law." *Id.* at 883.

Congress has defined the term "conviction," with respect to an alien, as "a formal judgment of guilt of the alien entered by a court or [] where - (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere [] , and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed." 8 U.S.C. § 1101(a)(48)(A). As the majority opinion concedes, in order to be assigned to youthful trainee status under Michigan's HYTA, an individual charged with an offense must plead guilty; Ejelonu "took advantage of this opportunity;" and the court placed her on probation and ordered her to make restitution. Although M.C.L. § 762.11 does not define Ejelonu's guilty plea as a conviction per se, it was certainly not unreasonable for the IJ or BIA to determine that it was a conviction within the meaning of § 1101(a)(48)(A). A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by an agency. *Chevron U.S.A., Inc, v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984).

## II.

Dissatisfied with the result dictated by Ejelonu's inability to succeed on the claims that she *did* raise, the majority now sua sponte decides that Ejelonu in fact petitioned this Court for a writ of *audita querela*. There is no support for this conclusion in Ejelonu's Petition for Review or in any of the parties' briefs. Ejelonu did not request a writ of *audita querela*, or any other writ, for that matter. The government, understandably failing to divine the possibility that the majority of this panel would conjure up an extraordinary, out-of-use writ to reach the end it seeks, had no opportunity whatsoever to brief or otherwise address the issuance of such

a writ. The *only* questions raised by Ejelonu, and therefore, the only questions before this Court, are (1) whether the BIA erred in holding that her guilty plea constitutes a "conviction" for immigration purposes, and (2) whether the BIA erred in upholding the IJ's determination that she was not a citizen. Our analysis should have been limited to those questions.

If Ejelonu had in fact requested a writ of *audita querela*, it would be improper for this Court to grant one. Congress prohibited the federal courts from using the writ in civil cases in the 1940s. *See* Fed. R. Civ. Pro. 60(b). "Writs of *coram nobis, coram vobis, audita querela*, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in the rules or by an independent action." *Id.* This was quite in line with no less an authority than William Blackstone, who, in 1768, said of the writ,

[It] is a writ of a most remedial nature, and seems to have been invented, lest in any case there should be an oppressive defect of justice, where a party has a good defence, but by the ordinary forms of law had no opportunity to make it. But the indulgence now shown by the courts in granting a summary relief upon motion, in cases of such evident oppression, has almost rendered useless the writ of *audita querela*, and driven it quite out of practice.

3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 405 (William D. Lewis ed. 1900).

Rule 60(b) clearly applies to this appeal from an order of the BIA, which is a civil matter, and not, as the majority seems to imply, "a criminal proceeding." As the Supreme Court itself has noted, "[a] deportation proceeding is a purely civil action to determine eligibility to remain in this country." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).

Struggling to explain its conjuration, the majority says, "As an infrequently used remedy, modern courts have struggled to define the scope of the writ." This assertion is simply not accurate. Courts have not, in cases like the one before us now, "struggled" at all. Every circuit that has addressed this issue has refused to issue a writ of *audita querela* absent proof of some legal defect in the underlying proceedings, or a legal objection that arose subsequent to the underlying proceeding. And in each of these cases—unlike the instant case—the petitioner sought to vacate a conviction. *See United States v. Alaya*, 894 F.2d 425, 430 (D.C. Cir. 1990) (denying petitioner's request for the writ and holding that "a federal court can vacate a criminal conviction pursuant to the common law writ of *audita querela* only if the writ permits a defendant to raise a legal objection not cognizable under existing federal postconviction remedies"); *Doe v. INS*, 120 F.3d 200, 204 (9th Cir. 1997) (holding that "a writ of *audita querela*, if it survives at all, is available *only* if a defendant has a legal defense or discharge to the underlying judgment") (emphasis added); *United States v. LaPlante*, 57 F.3d 252, 253 (2d Cir. 1995) ("Audita querela is probably available *where there is a legal, as contrasted with an equitable, objection* to a conviction that has arisen subsequent to the conviction and that is not redressable pursuant to another post-conviction remedy.") (emphasis added); *United States v. Johnson*, 962 F.2d 579, 582-83 (7th Cir. 1992) ("The defense or discharge must be a legal defect in the conviction . . . . Equities or gross injustice, in themselves, will not satisfy the legal objection requirement and will not provide a basis for relief."); *United States v. Reyes*, 945 F.2d 862, 866 (5th Cir. 1991) (stating that allowing the writ "to vacate a conviction on purely equitable grounds . . . 'purports to add a new remedy'" for which there is "no adequate statutory or historical warrant to authorize federal courts to grant such relief"); *United States v. Holder*, 936 F.2d 1, 5 (1st Cir. 1991) (holding that the writ, "if available at all . . . can only be available where there is a *legal* objection to a conviction, which has arisen subsequent to that conviction, and which is

not redressable pursuant to another post-conviction remedy") (emphasis in original).

According to Black's Law Dictionary, a writ of *audita querela* is "a common law writ constituting the initial process in an action brought by a judgment defendant to obtain relief against the consequences of the judgment *on account of some matter of defense or discharge arising since its rendition* and which could not have been taken advantage of otherwise." BLACK'S LAW DICTIONARY 120 (spec. 5th ed. 1979) (emphasis added); s*ee also, Reyes*, 945 F.2d at 863 n.1 (same). The other circuits that have considered the writ could not have been more clear in their findings. "[T]he writ of *audita querela* does not and cannot, under any stretch of the imagination, provide a purely equitable basis for relief independent of any legal defect in the underlying judgment." *Holder*, 936 F.2d at 3.

Nonetheless, in the present case, the majority relies solely on its appeal to equity to grant the "requested" relief. The majority acknowledges there was no legal defect in the underlying proceedings, and fails to cite to any subsequent fact or defense, arising after judgment, that Ejelonu could not have previously raised. The majority instead relies upon the writings of one law professor, as well as selected quotes from William Blackstone and historian William Holdsworth for the proposition that the writ is of "essentially equitable character." From there the majority concludes that granting a writ of *audita querela* is appropriate in the present case because it would be "contrary to justice" to do otherwise.

The majority's reasoning is specious. The proposition that the writ has a basis in equity does not support the conclusion that it can or should be granted to prevent a perceived injustice. Although the majority frequently quotes Blackstone, it fails to note that Blackstone himself emphasized that one seeking the writ must show a post-judgment contingency supplying a "matter of discharge" or "defense." 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE

LAWS OF ENGLAND 404 (William D. Lewis ed. 1900). Indeed, the majority's use of equity in this case entirely overlooks one of the fundamentals of the nature of equity: "Equity suffers not a *Right* to be without a Remedy." Richard Francis, MAXIMS OF EQUITY 24 (London, Bernard Lintot 1728) (emphasis added). Equity, in other words, does not exist "upstairs over a vacant lot;" rather, equity is founded on rights, and exists to provide a remedy unavailable at law when those rights are violated. Nowhere does the majority opinion identify the "right" of this petitioner that the majority would remedy through the use of this writ.

Nor is the case law employed by the majority persuasive. The majority gives particular weight to the Tenth Circuit's decision in *Oliver v. City of Shattuck ex rel. Versluis*, 157 F.2d 150 (10th Cir. 1946), a case that pre-dated and helped to prompt the 1946 amendments to Rule 60(b) that abolished *audita querela* and similar writs. *See* Ira P. Robbins, *The Revitalization of the Common-Law Civil Writ of Audita Querela as a Postconviction Remedy in Criminal Cases: The Immigration Context and Beyond*, 6 GEO. IMMIGR. L.J. 643, 660 (1992) ("As a result of *Oliver* and other Rule 60(b) cases, *audita querela* and *corum nobis* clearly still existed as civil remedies . . . . The advisory committee reacted to this development by amending Rule 60 in 1946.") (citations omitted). Even *Oliver*, moreover, stated that the writ was invented to afford relief to "one against whom execution had been issued or was about to be issued upon a judgment, which it would be contrary to justice to allow to be enforced, *because of matters arising subsequent to the rendition thereof*." *Oliver*, 157 F.2d at 153 (emphasis added).

This defect in reasoning is not cured by the curious argument in the majority's footnote 5 that "the removal proceeding against Petitioner under 8 U.S.C. § 1227(a)(2)(A)(ii) constituted a matter which arose *subsequent* to the disposition under the HYTA." This completely misses the point. The order before us in this appeal—and the order to which the majority opinion purports

to direct this extraordinary writ—is the order of the BIA dismissing Ejelonu's appeal of the IJ's order of removal. The order before us is *not*, as the majority seems to believe in footnote 5, Ejelonu's state conviction—an order over which this court has no jurisdiction. In its final paragraphs, the majority opinion seems to recognize this, stating that "[o]ur mandate does not vacate or even suggest the invalidity of Michigan's 'judgment' . . . nor do we purport to lift any of the concomitant sanctions Michigan imposed." As a matter of logic, the argument in footnote 5 and this statement from the majority cannot both be true. *See* ARISTOTLE, METAPHYSICS, § 1005b12-20 ("[T]he most certain principle of all is that about which it is impossible to be mistaken . . . . It is clear, then, that such a principle is the most certain of all and we can state it thus: 'It is impossible for the same thing at the same time to belong and not belong to the same thing at the same time and in the same respect.'"). And as a matter of law, the only order to which this court has jurisdiction to direct an extraordinary writ is the order of the BIA. Even if Congress, *arguendo*, had not expressly eliminated the writ of *audita querela* in civil proceedings, the only events material to this court's review would be events occurring subsequent to the BIA's order.

The majority relies upon two district court cases, *United States v. Salgado*, 692 F. Supp. 1265 (E.D. Wash. 1988), and *United States v. Ghebreziabher*, 701 F. Supp. 115 (E.D. La. 1988), as examples of courts' granting writs of *audita querela* for purely equitable reasons, "to mitigate the collateral consequences of an earlier criminal conviction when failing to do so would have produced an unconscionable result." The majority's reliance on these cases is severely misplaced. *Salgado* and *Ghebreziabher* have been widely and, until today, uniformly criticized by each circuit that has considered this issue. Neither case represents the law of the land in its own circuit. *See Doe*, 120 F.3d at 203 (finding that "*Salgado* and *Ghebreziabher* were mistaken, as a historical matter, in their conclusion that *audita querela* furnishes a purely 'equitable' basis for relief independent of any legal defect in

the underlying judgment"); *Reyes*, 945 F.2d at 866 (stating that "the *Salgado* and *Ghebreziabher* courts had strayed from the original bounds of the writ" and that such use of the writ "usurp[ed] the power of Congress to set naturalization and deportation standards and the power of the INS to administer those standards"). Unable to find anything to support its holding, the majority also cites to *United States v. Javanmard*, 767 F. Supp. 1109 (D. Kan. 1991), a case in which, as the majority itself admits, "the court *refused* to grant a writ of *audita querela*" under the belief that it could only do so if a legal error occurred in the initial proceeding. *See id.* at 1110-11.

Having sua sponte granted the writ, the majority opinion anticipatorily repudiates the well-deserved charge that the granting of this writ raises separation of powers concerns, protesting that "[i]f Congress dislikes what we have done, it can prohibit courts from issuing writs of *audita querela* with respect to the collateral consequences of criminal convictions just as Congress terminated the judiciary's ability to issue such writs in ordinary civil proceedings by implementing Fed. R. Civ. P. 60(b)." This statement necessitates one of two conclusions, both of which are untenable. The first is that the Court is vacating the collateral consequence of the underlying state action. This Court has no authority to take such action, and such an interpretation clearly contradicts the majority's statement that its mandate "does not vacate or even suggest the invalidity of Michigan's 'judgment.'" The only other possible interpretation is that Ejelonu's appeal to the BIA, and the underlying judgment of the IJ, are "criminal proceedings" and the order of removal is a "criminal conviction." The Supreme Court, I suspect, would be surprised by this view. *See INS v. Lopez-Mendoza*, 468 U.S. at 1038 ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country."). The majority protests further that its holding portends no threat to the ability of DHS to carry out its statutory duties, because this opinion "will not support relief if deportation is either not unconscionable or where DHS can articulate *any* legitimate reason for its decision to

deport." (emphasis in original). But the DHS *did* articulate a legitimate reason for its decision to deport: Ejelonu was deportable under 8 U.S.C. § 1227(a)(2)(A)(ii), and the majority opinion concedes that it can point to no legal defect in that conclusion.

### III.

I do not want to see Ejelonu deported. If the majority opinion represented a legitimate means by which to overturn the BIA's deportation order, I could—and would—join it without hesitation. It doesn't, and I can't. The writ of *audita querela,* which Congress has explicitly abolished in civil proceedings, cannot provide any legal basis for relief in this case. Today's majority, by *sua sponte* granting this writ, intrudes upon the power of Congress to set naturalization and deportation standards and the power of the Department of Homeland Security to administer those standards in each individual case. "Absent a clearer statutory or historical basis, an Article III court should not arrogate such power unto itself." *Reyes*, 945 F.2d at 866.

For the foregoing reasons, I respectfully dissent.